UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| | . | |
| UNITED STATES OF AMERICA, | . | Case No. 22-cr-98-9 |
| | . | |
| Plaintiff, | . | |
| | . | |
| vs. | . | 601 Market Street |
| | . | Philadelphia, PA 19106 |
| EDWIN BURGOS, | . | |
| | . | |
| Defendant. | . | Tuesday, October 17, 2023 |
| . . . . . . . . . . . . . . . | . | 10:22 a.m. |

TRANSCRIPT OF SENTENCING HEARING
BEFORE THE HONORABLE JOHN MILTON YOUNGE
UNITED STATES DISTRICT COURT JUDGE

APPEARANCES:

For the Plaintiff:          United States Attorney's Office
                            By:  PRIYA T. DESOUZA
                            615 Chestnut Street, Suite 1250
                            Philadelphia, PA  19106
                            (215) 861-8344

For the Defendant:          The Law Office of Caroline Goldner
                            Cinquanto
                            By:  CAROLINE A. GOLDNER CINQUANTO
                            2 Greenwood Square
                            3331 Stret Road, Suite 450
                            Bensalem, PA  19020
                            (267) 656-7412

Audio Operator:             Kimberly Scott, ESR

Transcription Company:      Access Transcripts, LLC
                            10110 Youngwood Lane
                            Fishers, IN 46048
                            (855) 873-2223
                            www.accesstranscripts.com

     Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

I N D E X
10/17/23

PAGE

**WITNESS FOR THE GOVERNMENT**

Alan Gilmore

  Direct Examination by Ms. Desouza            24

  Cross Examination by Ms. Cinquanto            34

  Redirect Examination by Ms. Desouza          50

  Recross Examination by Ms. Cinquanto         64

  Further Redirect Examination by Ms. DeSouza  68

  Further Recross Examination by Ms. Cinquanto 97

  Further Redirect Examination by Ms. DeSouza  101

**WITNESS FOR THE DEFENDANT**

Juan Marrero

  Direct Examination by Ms. Cinquanto          109

Antonio Burgos

  Direct Examination by Ms. Cinquanto          114

  Cross Examination by Ms. DeSouza             117

**STATEMENTS ON BEHALF OF DEFENDANT**

Statement by Alicia Burgos                       118

Statement by the Defendant                       141

**ARGUMENT AS TO SENTENCE**

Argument by Ms. Cinquanto                        122

Argument by Ms. Desouza                          129

**SENTENCE**                                     144

| **EXHIBITS** | **EVD.** |
|---|---|
| Government's Exhibits 1 and 2 | 62 |
| Government's Exhibits 3 and 4 | 33 |
| Government's Exhibits 5A and 5B | 54 |
| Government's Exhibit 6 | 87 |
| Government's Exhibit 7 | 129 |

```
 1                  (Proceedings commence at 10:22 a.m.)
 2              THE CLERK:  All rise.  Court is now session, the
 3    Honorable John Younge presiding.  Case Number 22-CR-98-9,
 4    United States of America vs. Burgos.
 5              THE COURT:  Good morning.
 6              MS. DESOUZA:  Good morning, Your Honor.
 7              MS. CINQUANTO:  Good morning, Your Honor.
 8              THE DEFENDANT:  Good morning.
 9              THE COURT:  A lot of stuff going on here.  Is it cold
10    in here?
11              UNIDENTIFIED:  Yes.
12              UNIDENTIFIED:  Very cold.
13              THE COURT:  Can we do something about that?
14              Counsel for the Government, please identify yourself
15    for the record.
16              MS. DESOUZA:  Good morning, Your Honor.  Priya
17    DeSouza on behalf of the United States and to my right is the
18    lead ATF special agent in this matter, Alan Gilmore.
19              THE COURT:  Good morning, Ms. DeSouza.  Good morning,
20    Agent Gilmore.
21              MR. GILMORE:  Good morning, Your Honor.
22              THE COURT:  And for the defense?
23              MS. CINQUANTO:  Good morning, Your Honor.  Caroline
24    Cinquanto on behalf of Edwin Burgos.
25              THE COURT:  Are you Mr. Burgos?
```

1              THE DEFENDANT:  Yes, sir.

2              THE COURT:  And from the probation office?

3              MR. PISCAI:  Good morning, Your Honor.  Brian Piscai

4    (phonetic) on behalf of probation.

5              THE COURT:  All right.  Good morning.  And in the

6    audience, you all may be seated.

7              I'm going to have to warn you from the start,

8    Ms. DeSouza, Ms. Cinquanto, that I have a 12:30 hearing and

9    we're starting a half hour late, and I'm not certain that we

10   will finish this, based on everything that's been told to me

11   about the matters of proof and things of that nature, so we

12   will go until we have to break.  All right?

13             MS. DESOUZA:  Understood.

14             THE COURT:  Mr. Edwin Burgos was indicted on

15   March 17th, 2022, pled guilty before me on May 4th, 2023, to

16   three charges:  Count 1, Conspiracy, violation of 18 United

17   States Code Section 371; Count 2, Dealing in Firearms Without a

18   License and Aiding and Abetting, 18 United States Code

19   Section 922(a)(1)(A), 924(a)(1)(D) and (2); and Count 3, Travel

20   with Intent to Deal in Firearms Without a License, 18 United

21   States Code Section 924(n) and (2).

22             Ms. Cinquanto, will be any witnesses testifying for

23   the defense here?

24             MS. CINQUANTO:  Yes, Your Honor.  We have three

25   character witnesses who will be testifying.  That would

1  Mr. Burgos's mother, a pastor from his church, and his cousin.

2              THE COURT:  Very well.

3              MS. CINQUANTO:  And then we have a number of folks in

4  the gallery, Your Honor.

5              THE COURT:  Understood.  And we will identify them at

6  the appropriate time.

7              MS. CINQUANTO:  Yes, sir.

8              THE COURT:  Ms. DeSouza, are there any law

9  enforcement officers that will be testifying here today?

10             MS. DESOUZA:  Your Honor, I expect that Special Agent

11 Gilmore will testify to any facts that haven't been resolved in

12 the presentence report, and to provide a record for the

13 Government's position on any remaining objections to the

14 enhancements.

15             THE COURT:  Very well.  And, sir, are -- you prepared

16 the presentence report in this case?

17             MR. PISCAI:  That's correct, Your Honor.

18             THE COURT:  All right.  Thank you.  I'm going to take

19 a moment to outline the procedure that I will be following here

20 in court today.  I will first review the presentence

21 investigation report and hear and rule on any objections.  And

22 I note that the defense has raised at least two objections that

23 are still remaining?

24             MS. CINQUANTO:  That's correct, Your Honor.

25             THE COURT:  Very well.  I'll then hear any argument

```
 1  and rule on any outstanding motions.  I think the only

 2  outstanding motion is the motion for forfeiture.

 3            MS. DESOUZA:  I agree.

 4            THE COURT:  I don't believe the defense filed any

 5  motions other than to the presentence investigation report.

 6            MS. CINQUANTO:  Yes, Your Honor.  I actually filed a

 7  sentencing memorandum, but other --

 8            THE COURT:  I'm sorry.

 9            MS. CINQUANTO:  I filed a sentencing memorandum, Your

10  Honor.

11            THE COURT:  Yes.

12            MS. CINQUANTO:  Oh, that's what I --

13            THE COURT:  I'm saying other than your objection to

14  the calculation --

15            MS. CINQUANTO:  Correct.

16            THE COURT:  -- you didn't file any other motions.

17            MS. CINQUANTO:  Correct, Your Honor.

18            THE COURT:  Very well.  I'll then hear any argument

19  and evidence that the parties wish to present.  First, the

20  defense's position, witnesses, and arguments, then the

21  Government's position, witnesses, and arguments, and then I'll

22  hear from Mr. Burgos himself.  If necessary, we may then take a

23  brief recess to deliberate and consider the argument and

24  evidence presented by the parties, and then finally I'll

25  deliver Mr. Burgos's sentence and address the outstanding
```

 1  motion for forfeiture.

 2          Ms. Scott, can you now please swear in the defendant?

 3          Mr. Burgos, please rise.

 4          THE CLERK:  Can you raise your right hand and state

 5  your name for the record.

 6          THE DEFENDANT:  Edwin Burgos.

 7              EDWIN BURGOS, DEFENDANT, SWORN

 8          THE CLERK:  Thank you.

 9          THE COURT:  You may be seated.

10          Officer Piscai?

11          MR. PISCAI:  Yes.

12          THE COURT:  Is that correct?  Piscai?

13          MR. PISCAI:  Piscai.

14          THE COURT:  Piscai.

15          MR. PISCAI:  Yes.

16          THE COURT:  When did you prepare the presentence

17  investigation report and when was it last revised, if at all?

18          MR. PISCAI:  The draft of the presentence report was

19  prepared September 18th, 2023 and the final revision was

20  October 11th, 2023.

21          THE COURT:  Thank you.

22          Did both sides receive and have an opportunity to

23  review the presentence investigation report?

24          MS. DESOUZA:  Yes, Your Honor.

25          MS. CINQUANTO:  Yes, Your Honor.

```
 1                    THE COURT:  Mr. Burgos, have you reviewed the
 2     presentence investigation report with your attorney?
 3                    THE DEFENDANT:  Yes.
 4                    THE COURT:  And, sir, you may remain seated.
 5                    THE DEFENDANT:  Okay.
 6                    THE COURT:  I don't want the marshal behind you
 7     jumping up and down every time.
 8                    MS. CINQUANTO:  Okay.
 9                    THE COURT:  Please remain seated and pull the
10     microphone towards you.
11                    MS. CINQUANTO:  Yes, sir.
12                    THE COURT:  Sir, did your attorney answer any and all
13     questions that you had about the report?
14                    THE DEFENDANT:  Yes.
15                    THE COURT:  Do you feel you need additional time to
16     review the presentence investigation report?
17                    THE DEFENDANT:  No, sir.
18                    THE COURT:  Are you satisfied with the representation
19     that your attorney has provided to you up until this point
20     today?
21                    THE DEFENDANT:  Yes, sir.
22                    THE COURT:  Does the Government have any objection to
23     the presentence investigation report?
24                    MS. DESOUZA:  No, Your Honor.  We do have a couple of
25     corrections but no formal objections.
```

```
 1            THE COURT:  Let's state the corrections.
 2            MS. DESOUZA:  After speaking to defense counsel,
 3   there was -- the parties agree that there's a correction to be
 4   made on Page 11.  I spoke to the -- to Officer Piscai about
 5   this, as well.
 6            THE COURT:  Page 11?
 7            MS. DESOUZA:  Yes, Your Honor.  Page 11 of the
 8   presentence report.
 9            THE COURT:  What paragraph or what bullet point?
10            MS. DESOUZA:  The fifth bullet point down.
11            THE COURT:  From the top?
12            MS. DESOUZA:  Yes.
13            THE COURT:  Yes.
14            MS. DESOUZA:  So the statement reads, "On July 8th,
15   2020, Frederick Norman updated Kenneth Burgos on the firearms
16   order via text message as follows."  And the correction would
17   be is that Edwin Burgos's name is then listed, it should be
18   Kenneth Burgos that's listed in the text message content.
19            THE COURT:  Understood.  Any other corrections?
20            MS. DESOUZA:  On Page 43.
21            THE COURT:  Excuse me.  Sir, may -- remove your hat,
22   please.  Thank you.
23            Go ahead.
24            MS. DESOUZA:  On Page 43, Your Honor, the final
25   presentence report.
```

1            THE COURT:  Yes.

2            MS. DESOUZA:  Paragraph 46.  The first line reads,

3   "From June 26th, 2020, through November 27th, 2020, Fredrick

4   Norman received $116,714 in exchange for purchasing firearms."

5   It reads right now on behalf of Edwin Burgos.  In response to

6   defense objection, the parties agree that that should be edited

7   to read on behalf of the conspiracy.

8            THE COURT:  So stipulated?

9            MS. CINQUANTO:  Yes, Your Honor.

10           THE COURT:  Mr. Piscai, you'll make those

11  corrections --

12           MR. PISCAI:  Yes, Your Honor.

13           THE COURT:  -- in the final draft?

14           Anything else?

15           MS. DESOUZA:  No, Your Honor.

16           THE COURT:  Defense objections?

17           MS. CINQUANTO:  Yes, Your Honor.  Your Honor, the

18  defense has two outstanding objections to be resolved.  The

19  first, Your Honor, is to the -- an objection to the base

20  offense level of 20 pursuant to United States Sentencing

21  Guideline 2K2.1(a)(4)(B).  And we object to this calculation

22  because the Government cannot prove by a preponderance of the

23  evidence that a semi-automatic firearm capable of accepting a

24  large capacity magazine was involved in this crime.

25           Application Note 2 of 2K2.1 defines a semi-automatic

1  firearm that is capable of accepting a large capacity magazine

2  as, a semi-automatic firearm that has the ability to fire many

3  rounds without reloading, because at the time of the offense,

4  which would be the actual purchasing of the weapon, the firearm

5  had attached to it at the time it was purchased a magazine or a

6  similar device that could accept more than 15 rounds of

7  ammunition.  Or, Your Honor, a magazine or a similar device

8  that could accept more than 15 rounds of ammunition was in

9  close proximity to the firearm at the time of the offense which

10  would be the time that these weapons were purchased in

11  Georgia -- at the time that they were straw purchased.

12        The Government cannot prove that at the time of the

13  offense, which would be the purchase of the firearms, that the

14  firearms had attached to it a magazine or similar device that

15  could accept more than 15 rounds of ammunition or that a

16  magazine or similar device that could accept more than

17  15 rounds of ammunition was in close proximity to the firearms

18  at the time that they were purchased.

19        Your Honor, that's our objection.  The Government in

20  their sentencing memorandum has -- have talked about five

21  specific firearms out of the 292 that were purchased that they

22  alleged were high-capacity magazines because at the time they

23  were purchased they had attached to it a magazine that was a

24  high-capacity magazine which would accept more than 15 rounds

25  of ammunition.

```
 1              So, Your Honor, I'm prepared to respond to each of
 2    those weapons individually unless Your Honor would prefer now
 3    to turn this over to the Government for their evidence because
 4    that's my objection.  I can respond to each of the weapons.
 5              THE COURT:  Well, before I do that, I'd like to hear
 6    from the probation officer.
 7              MR. PISCAI:  Sure.
 8              THE COURT:  And before we get into that, it's my
 9    observation, based on having presided over this case that the
10    same base level has been issued to Roger Millington but not to
11    Fredrick Norman or Kenneth Burgos.  You did not prepare those
12    reports.
13              MR. PISCAI:  I did not, Your Honor.
14              THE COURT:  But neither -- I should say, both
15    Fredrick Norman and Kenneth Burgos, if we were to assess
16    Mr. Edwin Burgos with the automatic weapon enhancement,
17    Mr. Fredrick Norman, having purchased the weapon should have
18    been assessed, also, but was not.  Mr. Kenneth Burgos should
19    have been assessed the automatic weapon enhancement but was
20    not.  Why was that?
21              MR. PISCAI:  Yes, Your Honor.  As you said, I did not
22    prepare those reports.
23              THE COURT:  Mr. Roger Millington was assessed a 20
24    presumably because of the automatic weapon enhancement but he
25    was not assessed an additional enhancement for that.  Mr. -- I
```

 1  should say, Mr. Roger Millington was assessed the automatic

 2  weapon enhancement as well as considered a prohibited person.

 3  Mr. Kenneth Burgos was not assessed the automatic weapons

 4  enhancement nor was he considered a prohibited person even

 5  though he participated in the same fight which caused Mr. Roger

 6  Millington and Edwin Burgos to get the enhanced base level.  I

 7  don't understand that.

 8           MR. PISCAI:  Yes, sir.

 9           THE COURT:  So before I get into all of that minutia

10  I need to understand how that happened.

11           MR. PISCAI:  I understand, Your Honor.  As I said, I

12  did not prepare this report so I can't speak to the specifics

13  of those base --

14           THE COURT:  Well, Mr. Kenneth Burgos was involved in

15  the same fight and purchased the same weapons and he was a 12.

16           MS. DESOUZA:  Your Honor, I can speak to it since

17  I've been involved in all of the co-conspirators.

18           THE COURT:  I figured you would.

19           MS. DESOUZA:  If you'll hear me.

20           THE COURT:  I will.

21           MS. DESOUZA:  Your Honor stated it just now that

22  Kenneth Burgos and Fredrick Norman are not prohibited persons

23  under the specific guideline events.  Kenneth Burgos was

24  involved in that fight.  He was prosecuted but he was

25  prosecuted as a juvenile and he received a juvenile

 1   adjudication as a result of it.

 2        The definition of prohibited person for this specific

 3   guideline events requires that a defendant is considered

 4   prohibited under, as applicable here, 922(g)(1).

 5        THE COURT:  I understand.  Because of the offense

 6   itself is punishable by more than a year.  Now, you probably

 7   didn't notice because you didn't practice on the state level,

 8   but any assault of an officer is considered an aggravated

 9   assault no matter how it is.  You can tell from the sentence,

10   though, that it was considered a simple assault, but even a

11   simple assault is punishable by more than a year, so there's no

12   real reason you can get past that.  But it does explain the

13   disparity, doesn't it, the fact that Kenneth Burgos was

14   involved as a juvenile as opposed to Mr. Edwin Burgos who was a

15   year older.

16        MS. DESOUZA:  Agreed, Your Honor.  And the same thing

17   with Fredrick Norman is that he had no prior record which --

18        THE COURT:  He had no prior record but he did

19   purchase the same automatic weapons.  If there were automatic

20   weapons that Mr. Edwin Burgos received, he had to have received

21   them Mr. Fredrick Norman who organized the purchase of them.

22        MS. DESOUZA:  I agree, Your Honor.  It is the

23   Government's position that he purchased high-capacity firearms.

24   He straw purchased them as part of this conspiracy with the

25   defendant.

 1          THE COURT:  But he did not receive an enhancement on

 2   the base level.

 3          MS. DESOUZA:  No, not that -- because that specific

 4   enhancement of an offense level of 20 would require the

 5   Government to prove that he was a prohibited person at the time

 6   that he committed the offense and the Government concedes that

 7   he wasn't.  That's why he was able to straw purchase.

 8          THE COURT:  So it wasn't simply the automatic

 9   weapons; it was -- you had to have both the automatic weapons

10   and be a prohibited person.

11          MS. DESOUZA:  Yes.  And you also have to -- if I may,

12   Your Honor, from the Government's point of view for this

13   specific subsection, you -- the Government must prove that the

14   firearm at the time of the offense, in this case, there's an

15   agreement that it's at the time of the straw purchasing that

16   there had to have been a high-capacity magazine attached to or

17   within the area of the firearm in question.  That the defendant

18   was a, quote, "prohibited person," as earlier discussed.  And,

19   finally, that the defendant had knowledge, intent, or reason to

20   believe that the offense would result in the transfer of a

21   firearm or ammunition to another prohibited person or a

22   prohibited person is the actual language.

23          In this case, my understanding is that the defendant

24   agrees to all of the elements except for the high-capacity

25   firearm.  But the last element is significant here, as the

1    Government discussed in the sentencing memorandum, that this

2    defendant knew who Roger Millington was because he had

3    committed an adult felony offense with him, so knew that

4    Mr. Millington was also a prohibited person, but he also knew

5    that his own father was a prohibited person for the reasons

6    discussed in the Government's sentencing memorandum, and

7    therefore, that last element is also met.  But those are

8    additional elements that were required for the Government and

9    were unable to be pursued by the Government with regards to

10   Kenneth Burgos and Fredrick Norman.

11          THE COURT:  And Mr. Fredrick Norman.

12          MS. DESOUZA:  Yes, sir.

13          THE COURT:  All right.  I think we all see where

14   we're at here, don't we?

15          You want to step back and let the Government proceed?

16          MS. CINQUANTO:  Yes, Your Honor.

17          THE COURT:  Now, before we -- do we have to do this?

18   Can you all come to an agreement or do we have to take

19   testimony on this?

20          MS. DESOUZA:  Your Honor, I'm prepared to proffer.  I

21   think there are exhibits that the Government has already

22   submitted as part of the sentencing memorandum, Government's

23   Exhibits 1 through 4.  In speaking with defense counsel, she

24   agrees can be submitted and recognized as part of the

25   evidentiary record in this case.

```
1              THE COURT:  I'm only suggesting it because of the
2    interesting variations here.  There's an eight-point
3    differential that makes a lot of difference, and you all can
4    cut through the chase and agree on that.  If not, we'll go
5    through the process.
6              MS. CINQUANTO:  Yes, Your Honor.  One moment.  Your
7    Honor, may we see you at sidebar?
8              THE COURT:  Yep.
9                          (At sidebar)
10             THE COURT:  Yes.
11             MS. CINQUANTO:  Your Honor, (indiscernible) as to
12   whether we're --
13             THE COURT:  What I'm saying is I'm think the numbers
14   are correct.  I think the numbers sometimes -- they analyze
15   give you new results.  They just do.  And in this case, the guy
16   that started the whole thing gets a 12 because he wasn't a
17   prohibited person but he certainly sold the weapons and he gets
18   a 12 and the other guy gets a 20, and he's a 34 as opposed to
19   27 which his cousin was who was also a leader but that eight
20   points makes a lot of difference.  And I can't say that the
21   numbers are wrong, at the end of the day, where you talked
22   about you the prohibited person.
23             The prohibited person, like I said, on the state
24   level, anytime you're in a fist fight with a cop is considered
25   an aggravated assault, but even a simple assault is greater
```

 1  than here.  It's under the Federal Guidelines.  It's still an

 2  enhancement.  It's a prohibited person.  But in terms of what

 3  this thing is moving towards, one guy is older than the other.

 4  It's hard to justify.

 5          MS. CINQUANTO:  Yes, Your Honor.

 6          THE COURT:  Based upon what everyone did, double?  I

 7  don't know.  But you know, if you want to go through the

 8  process, yes, you can put it on the record what those sales

 9  are, and I suspect that the sales will show that Mr. Fredrick

10  Norman purchased -- you can put your evidence on, but I've seen

11  a lot of this stuff.  You clearly marked stuff and the

12  Government doesn't have to prove these enhancements beyond a

13  reasonable doubt; it only has to prove by a preponderance of

14  the evidence.  Now, you know, you all can put your stuff on.  I

15  can handle it at the end, and I may just have to handle it at

16  the end, but this thing has the capacity of spinning out of

17  control and I don't think that's what we want to do.

18          MS. CINQUANTO:  I understand.  And I understand

19  (indiscernible).

20          THE COURT:  Mr. Burgos is not a good guy but I don't

21  know if he's a double-the-time bad guy as opposed to just a bad

22  guy.

23          MS. DESOUZA:  Well, I'm looking down the future

24  (indiscernible) and why can't we -- just cleaner for me, put on

25  the evidence through Agent Gilmore both in response to the high

1  capacity and the leadership.  So just in the matter of

2  efficiency, perhaps (indiscernible) state both her objections

3  and Agent Gilmore could testify before we --

4          THE COURT:  Well, that might work.

5          MS. DESOUZA:  -- people of (indiscernible) I provided

6  to defense counsel which is documented text messages or

7  statements from (indiscernible) involved in this case.  And

8  that's what I prepared for pursuant to (indiscernible).

9          THE COURT:  Was there an agreement -- was there --

10  Kenneth Burgos, did he have a -- he didn't have a CP, did he?

11          MS. DESOUZA:  He had a CP to recognize the transfer

12  plan.  He agreed to receive three levels instead of four

13  levels --

14          THE COURT:  Right.

15          MS. DESOUZA:  -- for his role in the conspiracy.

16          MS. CINQUANTO:  I think he also agreed to

17  (indiscernible).

18          MS. DESOUZA:  Yes.

19          MS. CINQUANTO:  He agreed to base (indiscernible).

20          MS. DESOUZA:  Right.

21          THE COURT:  Right.

22          MS. CINQUANTO:  Which I believe (indiscernible)

23  otherwise didn't have.

24          THE COURT:  As I said before, I don't -- I think

25  that -- I think that works.  I believe -- I think -- these

1  people from the probation office they know their stuff.  I

2  mean, it is what it is, but, like I said, sometimes the numbers

3  give you weird results.

4          MS. DESOUZA:  Sure.  And at first, Roger Millington

5  was subject to the same (indiscernible) but he was --

6          THE COURT:  He was not a leader.

7          MS. DESOUZA:  -- and he was without a conspiracy but

8  not --

9          THE COURT:  He ended up at 23 and he ended up with

10  48 months, and he got the top of his (indiscernible).  These

11  numbers and the way that they calculate them can sometimes give

12  you strange results.  So I looked at that and I said, 188

13  months?  How does he get 188 months and the other guy got 99

14  with an upward variance?

15          MS. CINQUANTO:  (Indiscernible).

16          THE COURT:  Take a deep breath, so I heard you.  I

17  urge everyone to take a deep breath.  Do what you got to do.  I

18  think you're right for the purpose of going forward and keeping

19  the record clear you should put your evidence on, you can make

20  your objection, but I think we got -- I think the guy, I think

21  he calculated correctly, but I don't think it gives you the

22  right -- it's a disparity and it's probably unwarranted.

23          MS. CINQUANTO:  (Indiscernible).

24          THE COURT:  You can make that.

25          MS. CINQUANTO:  (Indiscernible).

```
 1                 THE COURT:  All right.

 2                           (Sidebar concluded)

 3                 THE COURT:  All right.  Ms. DeSouza, do you want to

 4    go forward?

 5                 MS. CINQUANTO:  Oh, Your Honor, just one thing, Your

 6    Honor.  The second -- just so I could state the objections so

 7    that then Ms. DeSouza can --

 8                 THE COURT:  Certainly.

 9                 MS. CINQUANTO:  -- deal with both.  It would be the

10    objection to the leadership before level leadership

11    enhancement.

12                 THE COURT:  All right.

13                 MS. CINQUANTO:  So both of those issues can be

14    addressed at the same time.

15                 THE COURT:  It's -- Ms. DeSouza, it's two objections.

16    And before we go further, Mr. Piscai --

17                 MR. PISCAI:  Yes, Your Honor.

18                 THE COURT:  -- can you --

19                 MR. PISCAI:  Yes, Your Honor.

20                 THE COURT:  -- address the first one -- the first

21    objection --

22                 MR. PISCAI:  Yes.

23                 THE COURT:  -- and what you stated, and then we'll

24    ask Ms. DeSouza to proceed on the record.

25                 MR. PISCAI:  For the base offense level, Your Honor?
```

```
 1              THE COURT:  Yes.

 2              MR. PISCAI:  Okay.  As we responded, Your Honor,

 3    there was a high-capacity -- or several high-capacity magazines

 4    sold with the firearms in this case.  We list one example.

 5    That would be the VMAC45, Serial Number P13817, purchased from

 6    City Pawn.  That manager of City Pawn did verify that that

 7    weapon was sold with a 30-round magazine.

 8              THE COURT:  Well, you said they did verify.  You

 9    contacted them or you --

10              MR. PISCAI:  I did not, Your Honor.  The government

11    agent contacted them.

12              THE COURT:  All right.  We'll hear from the

13    government agent but based upon what was provided to you.

14              MR. PISCAI:  Yes, Your Honor.

15              THE COURT:  All right.

16              MR. PISCAI:  That that firearm was sold with a high-

17    capacity magazine and that does meet the definition of the

18    high-capacity magazine in the guidelines, therefore, the base

19    offense level of 20 applies in this case.

20              THE COURT:  All right.  Ms. DeSouza?

21              MS. DESOUZA:  Your Honor, the Government calls

22    Agent Alan Gilmore.

23              THE COURT:  Please come forward and be sworn.

24              THE CLERK:  You can raise your right hand and state

25    your name for the record.
```

```
 1              MR. GILMORE:  My name is Alan Gilmore, A-L-A-N

 2  G-I-L-M-O-R-E.

 3              ALAN GILMORE, GOVERNMENT'S WITNESS, SWORN

 4                      DIRECT EXAMINATION

 5  BY MS. DESOUZA:

 6  Q    Agent Gilmore, good morning.

 7  A    Good morning.

 8  Q    Sir, you understand you're here today to describe your

 9  investigation to the extent that it relates to the sentencing

10  of Edwin Burgos, correct?

11  A    Yes.

12  Q    So there has been an objection that you've heard,

13  obviously, as being in the courtroom, as to whether high-

14  capacity firearms were involved in this case.  Do you

15  understand that?

16  A    I do.

17  Q    For the purposes of our discussion today, do you

18  understand that a high-capacity firearm under the Sentencing

19  Guidelines is a magazine that has a capacity to hold more than

20  15 rounds of ammunition?

21  A    I do.

22  Q    And in this case, did you have a chance to review the

23  Government's sentencing memorandum in this case?

24  A    I have.

25  Q    And, specifically, on Page 8, were you aware of a chart
```

 1  that lists a total of six firearms that have been identified as

 2  at the time of their sale containing a high-capacity magazine?

 3  A    Yes.

 4  Q    Is that based on your investigation?

 5  A    Yes.

 6  Q    Can you tell the Court about your investigation which led

 7  you to this conclusion?

 8  A    From the beginning or just high-capacity magazines?

 9  Q    High-capacity magazines.

10  A    So just in my training and experience in firearms

11  trafficking cases including this one and others in the State of

12  Georgia that as a grand concept firearms can be sold with

13  what's considered a state-restricted magazine.  That is a

14  mag -- some certain states like California, Massachusetts have

15  restrictions on the capacity the magazine can have.  Georgia

16  does not have one.  And when we spoke to FFLs in Georgia, they

17  would confirm that they --

18            THE COURT:  Sorry.  FFLs?

19            THE WITNESS:  Federal Firearms Licensees.  I'm sorry.

20  Gun stores.

21            They order these firearms from the manufacturer.

22            MS. CINQUANTO:  Your Honor, I would object.  I know

23  that the agent has spoken with one FFL down in Georgia,

24  specifically, about this issue and I would like him to -- I

25  think it's appropriate that he just limit his comments to that,

```
 1  not to in general who he's spoken to because I have not
 2  received any information about --
 3          THE COURT:  Well, I'm going to overrule that.  The
 4  agent can testify to his experience.  You may cross-examine.
 5          MS. CINQUANTO:  Yes, Your Honor.
 6          THE COURT:  Proceed.
 7  Q    Agent, in fact, if I could backtrack.  I failed to ask you
 8  what that experience is.  How long have you been with ATF?
 9  A    I've been with ATF for -- it'll be seven years in January.
10  Q    As part of being a member of the ATF, have you received
11  training on how federally-licensed firearms dealers in the
12  United States function under law?
13  A    Yes.
14  Q    As part of your seven years with the ATF you also have
15  been involved in other gun trafficking investigations or the
16  unlawful dealing of firearms in the United States.
17  A    Yes, I have.
18  Q    In this case it's taken you to the State of Georgia, but
19  have you also reviewed and learned about practices of gun
20  dealers in other states?
21  A    I have.
22  Q    In this case with regards to the State of Georgia, are you
23  familiar with the state regulations with regards to firearms
24  and specifically high-capacity magazines?
25  A    I am.
```

1   Q    Now, you were discussing how in the State of Georgia high-

2   capacity magazines are not regulated.

3   A    Correct.

4   Q    But in other states they are.

5   A    That's true.

6   Q    And based on your conversation with the State of Georgia

7   firearm dealers --

8   A    Uh-huh.

9   Q    Let me rephrase that.  As part of your investigation here,

10  did you interview and obtain records from numerous federally-

11  licensed firearms dealers just with regards to this

12  investigation?

13  A    That's correct.

14  Q    Can you estimate how many gun dealers you communicated

15  with with regards to sales of straw purchased firearms in this

16  case?

17  A    At least four or five.  We didn't interview all of the

18  FFLs in question.

19  Q    Did you obtain records from a number of FFLs?

20  A    Yes, I did.

21  Q    And, in particular, based on your conversation or your

22  knowledge and your training with regard to gun dealers in the

23  State of Georgia, what is -- or what restrictions do they have

24  in terms of what they -- what type of magazines they sell?

25  A    None.

1    Q    Getting back to the table of firearms that are listed here

2    on Page 8 of the Government's sentencing memorandum, you

3    describe that each of those were determined to have been sold

4    with a high-capacity magazine.

5    A    That's correct.

6    Q    I'm focusing specifically on the Velocity firearms that --

7    what's referred to as a VMAC45 weapon.  Can you describe what

8    kind of firearm that is?

9    A    Sure.  It's a pistol.  If you're -- are familiar with a --

10   in the 1980s they had the MAC-10 or MAC-11.  It is a semi-

11   automatic version of that.  The firearm is a .44 -- .45 caliber

12   pistol round.

13   Q    As part of your role in the -- as the lead investigator,

14   did you review how that firearm is manufactured and sold?

15   A    Yes.  We -- if you go to the Velocity Firearms website, it

16   specifically lists that this firearm comes with one 30-round

17   magazine.

18   Q    At the time of its sale?

19   A    Correct.  FFLs order these firearms from the manufacturers

20   and that is how they receive them.

21   Q    In this case, the VMAC that was sold by Fredrick -- sold

22   to Fredrick Norman on July 8th, 2020, did you interview that

23   gun dealer?

24   A    I did.

25   Q    And did that gun dealer identify that he recalled selling

1  that firearm, that VMAC45 to Fredrick Norman?

2  A    Yes, he did.

3  Q    And did he recall what type of magazine he sold that gun

4  with?

5  A    30 or 32 rounds.

6  Q    Do you know what happened to that weapon?

7  A    Yes.

8  Q    During the course of your investigation, did you determine

9  that Fredrick Norman took photographs with that weapon?

10 A    Yes, he did.

11 Q    And are those the photographs that we have introduced into

12 evidence as -- in Government -- excuse me, that we will

13 introduce into evidence Government's Sentencing Exhibit 3 which

14 contains your interview with the FFLs as well as two

15 photographs?

16 A    Yes.

17 Q    Are those photographs fair and accurate depictions of what

18 you found in the cell phone records during your investigation?

19 A    Correct.

20 Q    You said that you know what happened to that weapon.

21 A    That's correct.

22 Q    Was it recovered by law enforcement?

23 A    Yes, it was.

24 Q    Again, with the regards to what's been submitted as

25 Government's Sentencing Exhibit 4, which documents the recovery

1   of that weapon, do you recall what that exhibit states?

2   A    It was recovered in New York City with a 30-round

3   magazine.

4   Q    Also listed on the table is a firearm with the make and

5   model of Canik, a semi-automatic firearm.  Do you remember that

6   firearm?

7   A    Yes, I do.

8   Q    And do you remember if that gun has been recovered in the

9   course of this investigation?

10  A    It has.

11  Q    And was it recovered with a high-capacity magazine?

12  A    Yes, it was.

13  Q    How do you know that?

14  A    It was loaded at the time of -- of its recovery, it was

15  loaded with 16 rounds in the magazine not including the one in

16  the chamber.

17  Q    Agent Gilmore, we've been taking about magazines.  Can you

18  explain to the Court the difference between a magazine sold

19  with a gun at the time of its purchase and something called an

20  extended magazine?

21  A    Sure.  So not all -- all extended magazines are high-

22  capacity magazines but not all high-capacity magazines are

23  extended magazines.  An extended magazine is an extra accessory

24  that could be purchased to be used with any firearm.  So let's

25  say a Glock 17 holds 17 rounds in its standard magazine.  A

1  person can buy as an accessory a 30-round magazine or 100-round

2  magazine that can be put into a Glock 17 but they are not sold

3  with the firearm.  The firearm is standard would come with a

4  17-round magazine.

5  Q    And in this case, getting back to that table, there are

6  capacities listed of 30 rounds for the Velocity firearms, as

7  well as 17, 18, 17, and 17 depending on the firearm listed

8  there.  Is that based on your knowledge of how those

9  manufacturers sell those firearms at the time of sale standard?

10  A    Yes.

11  Q    So with regards to the Velocity firearms, again, focusing

12  on that VMAC45 that you looked into, in particular, did you --

13  excuse me.

14      You described that the manufacturer sells that as a

15  packaged deal, essentially --

16  A    Correct.

17  Q    -- with a 30-round magazine at the time of sale.

18  A    That is how they list it on their website, yes.

19  Q    And based on your training and experience, would you

20  expect a standard magazine that comes at the time of sale to be

21  listed any differently on a receipt, for example?

22  A    No, I would not.  The magazine -- unless a specific extra

23  magazine is purchased, the magazine is never listed on a

24  receipt.

25  Q    And in this case your investigation showed that there were

1  actually two VMAC weapons that were sold to Fredrick Norman or

2  one of his co-conspirators.

3  A    That's true.  From the same gun store.

4  Q    Those being on July 8th and July 13th, 2020.

5  A    That's correct.

6  Q    Based on your conversation with that gun dealer, what

7  position did that dealer have as to whether a reduced capacity

8  or a state-restricted magazine would have been sold with that

9  VMAC?

10  A    He would not have ordered a firearm with a state-

11  restricted magazine.  They're more difficult to sell in

12  Georgia.

13          MS. CINQUANTO:  Your Honor, I have to object.

14  There's --

15          THE COURT:  Sustained.

16          MS. CINQUANTO:  -- a summary of a conversation --

17          THE COURT:  I sustained.

18          MS. CINQUANTO:  Excuse me.

19          THE COURT:  I sustained.

20          MS. CINQUANTO:  Yes, Your Honor.

21  Q    Agent Gilmore, did you ask that dealer specifically

22  whether or not he sells reduced or state-restricted magazines

23  with his guns?

24  A    Yes, I did.

25  Q    And did he provide you with an answer?

1  A    Yes, he did.

2  Q    What was his response?

3  A    He would not order firearms through a manufacturer with

4  state-restricted magazines because they are more difficult to

5  sell.

6  Q    Did he -- excuse me.

7            MS. DESOUZA:  May I have a moment, Your Honor?

8            THE COURT:  Yes.

9  Q    Agent, your summary with that FFL dealer has been marked

10  as Sentencing Exhibit 3, Pages 1 and 2.  Is your summary

11  accurate as to the conversation you had with that dealer?

12  A    To the best of my knowledge, yes.

13           MS. DESOUZA:  Your Honor, the Government would move

14  into evidence what's already been provided to the Court as

15  Government's Exhibits -- Sentencing Exhibits 3 and 4 which

16  would be what Agent Gilmore testified to as well as the

17  photographs that he described.  And Government Exhibit 4 would

18  be the documentation of the recovery of that firearm showing

19  that it was recovered with the same 30-round magazine.

20           THE COURT:  Very well.

21           MS. CINQUANTO:  No objection, Your Honor.

22       (Government's Exhibits 3 and 4 admitted into evidence)

23           MS. DESOUZA:  Your Honor, the Government -- I'm

24  sorry.  Your Honor, I will continue my examination with the

25  Court's permission as to the other objections with regards to

 1   the enhancement.

 2              THE COURT:  Why don't we -- with regard to

 3   enhancements?

 4              MS. DESOUZA:  The sentencing enhancements.  That's

 5   was with regards to the high-capacity firearms.  Agent Gilmore

 6   can also speak to leadership and when Mr. --

 7              THE COURT:  Well, let's kind of separate them and

 8   let's get any cross-examination as to the automatic weapons

 9   enhancement.

10              MS. DESOUZA:  Understood.

11                      CROSS-EXAMINATION

12   BY MS. CINQUANTO:

13   Q   All right.  Good morning, Agent.  How are you?

14   A   Good morning, ma'am.

15   Q   All right.  You testified regarding a chart that was --

16              MS. CINQUANTO:  What page was that on, Ms. DeSouza?

17              MS. DESOUZA:  Page 8.

18   Q   -- Page 8 of the sentence -- the presentence investigation

19   report.  Do you have that in front of you?

20   A   No.

21              MS. CINQUANTO:  Okay.  One moment, Your Honor.

22              THE COURT:  Yes.

23   Q   So I'm going to focus on the table that was put together

24   by probation regarding the high-capacity magazines.

25              MS. CINQUANTO:  And that's found on Page 42 of the

 1  presentence investigation report, Your Honor.

 2  Q    Okay.  The first weapon I want to focus on is a weapon

 3  that was sold on July 8th of 2020.  That was the VMAC45.  Is

 4  that correct?

 5  A    Correct.

 6  Q    All right.  And, again, that was purchased on July 8th,

 7  2020.  Is that right?

 8  A    Correct.

 9  Q    And that was purchased by Fredrick Norman.  Is that right?

10  A    Yes.

11  Q    Okay.  Now, you understand that the defense is maintaining

12  that Edwin Burgos did not join this conspiracy until July 12th

13  of 2020.  Is that right?

14  A    I understand that's your position, yes.

15  Q    Okay.  It's my position because there's no text messages

16  between Fredrick Norman and Edwin Burgos before July 12th of

17  2020, correct?

18  A    Correct.

19  Q    All right.  There's no text messages regarding gun sales

20  involving Edwin Burgos before July 12th of 2020, correct?

21  A    Actually, it's not correct.  July 11th.

22  Q    July 11th.

23  A    Yes, ma'am.

24  Q    Okay.  My mistake.

25  A    No, it was mine, also.

Gilmore - Cross                                        36

1   Q    But before July 11th there's no text messages regarding

2   gun purchases by Edwin Burgos, right?

3   A    Correct.

4   Q    Okay.  And the -- we know that Kenneth Burgos and Fredrick

5   Norman started this conspiracy, right?

6   A    Yes.

7   Q    Okay.  And we know that this conspiracy started

8   approximately June 21st of 2020.  Is that right?

9   A    I think June 17th is when the first text message --

10  Q    All right.

11  A    -- takes place.

12  Q    And we know that after this conspiracy starts between

13  Fredrick and Kenneth, they then start recruiting people to

14  participate in the conspiracy.

15  A    Correct.

16  Q    Okay.  And, eventually, Edwin Burgos is recruited by

17  Kenneth Burgos, correct?

18  A    I'm not sure how he is -- enters it.  I would surmise

19  that, yes, he's recruited by Kenneth Burgos.

20  Q    Okay.  Because Kenneth Burgos is his cousin, right?

21  A    Correct.

22  Q    All right.  And, again, not to belabor the point, but we

23  don't have any text messages about any weapons before July

24  7th -- July 11th of 2020?

25  A    No.  There was no communication between Fredrick Norman

1  and Edwin Burgos before that.

2  Q    But we do have communication between Kenneth Burgos and

3  Fredrick Norman in June all the way through August, correct?

4  A    I believe so, yes.

5  Q    All right.  And we know that Kenneth Burgos was ordering

6  weapons from June all the way through August, correct?

7  A    I believe so, yes.

8  Q    And, specifically, we know that Kenneth Burgos and

9  Fredrick Norman spoke or texted on July 7th and July 8th

10 regarding about a purchase of guns that Fredrick Norman bought.

11 A    I believe so, yes.

12 Q    All right.  But there's no conversation between Edwin

13 Burgos and Fredrick Norman about a VMAC that was purchased on

14 July 7th or July 8th, correct?

15 A    No, there's not.

16 Q    Okay.  And, in fact, there's no conversations at all until

17 July 11th, correct?

18 A    Not between Edwin and -- and Fredrick Norman, correct.

19 Q    Okay.  So it's more likely that this VMAC was purchased

20 prior to the time that Edwin Burgos even joined this

21 conspiracy.

22 A    There are -- all their communications between Edwin and

23 Kenneth and between Edwin and Roger Millington that take place

24 prior to July 11th specifically around the dates and times of

25 some of these purchases.

 1  Q    There's phone records, correct?

 2  A    Correct.  Yes.

 3  Q    There's no substance of those phone records, right?

 4  A    That's correct.

 5  Q    And we know that Roger Millington and Edwin Burgos are

 6  brothers, correct?

 7  A    That's correct.

 8  Q    And we know that Kenneth and Edwin are cousins, correct?

 9  A    Yes.

10  Q    So it's not unusual for brothers and cousins to be

11  communicating via the phone prior to July 11th of 2020.

12  A    That is correct.

13  Q    But what would be unusual is if this man is ordering

14  weapons from Fredrick Norman and there's no text messages,

15  there's no writing, there's nothing to indicate an order that

16  he placed or the type of weapon he received, correct?

17  A    Would it be unusual?

18  Q    It would be -- well, we --

19  A    I -- I'm just trying to clarify what you were asking.

20  Q    Well, let's put it this way.

21  A    Sorry.

22  Q    You reviewed the text messages between Edwin and Fredrick

23  Norman, correct?

24  A    Yes, I have.

25  Q    I think you saw a few thousand -- a couple thousand text

1   messages, correct?

2   A    That's correct.

3   Q    There were text messages all the time between those two.

4   A    Correct.

5   Q    Edwin Burgos was not shy about texting Fredrick Norman,

6   right?

7   A    Correct.

8   Q    You know, and Fredrick Norman was not shy about texting

9   Edwin Burgos, correct?

10  A    Correct.

11  Q    All right.  But what we -- and these text messages would

12  involve weapons, what to buy, how much they were going to pay,

13  when they were going to pay, when they were going to be

14  delivered, correct?

15  A    Correct.

16  Q    Okay.  But so my question to you is that it is unusual

17  that there were no text messages at all regarding the purchase

18  of this particular VMAC45 at all.

19           THE COURT:  How would he know it was unusual, ma'am.

20           MS. CINQUANTO:  Well --

21           THE COURT:  Rephrase.

22           MS. CINQUANTO:  I'll rephrase.

23  Q    In your investigation you saw many text messages between

24  Edwin and Fredrick discussing the purchase of weapons, correct?

25  A    Yes.

```
 1   Q    The type, correct?

 2   A    Yes.

 3   Q    The quantity?

 4   A    Yes.

 5   Q    The purchase?

 6   A    Yep.

 7   Q    Okay.  What you didn't find in your investigation was any

 8   text messages between Edwin and Fredrick about this particular

 9   weapon that was purchased on July 8th of 2020.

10   A    Correct.

11   Q    In fact, there were no text messages until July 11th of

12   2020, correct?

13              MS. DESOUZA:  Objection.  Asked and answered.

14              THE COURT:  You can answer.

15              THE WITNESS:  Correct.

16   Q    All right.  I want to talk about the second -- the Canik

17   that was recovered.  There was another weapon that was

18   recovered.  Is that right?

19   A    Correct.

20   Q    And that would be the Canik.  Is that right?

21   A    Canik TP9SF.

22   Q    All right.  Now, this weapon was recovered.  Is that

23   right?

24   A    That's correct.

25   Q    It was purchased by Charles O'Bannon.  Is that right?
```

1    A    Correct.

2    Q    All right.  And this weapon is sold with either a

3    10-bullet or an 18-bullet magazine.  Is that right?

4    A    It has the option to be purchased with a state-restricted

5    magazine from the manufacturer and that would be a 10-round

6    magazine, yes.

7    Q    Okay.  Well, let me just ask you this.  I mean, in Georgia

8    you can buy a weapon like this with a 10-round magazine or an

9    18-round magazine, correct?

10   A    Only if the store would order it from Canik with

11   specifically a 10-round magazine.  If they were to order it

12   traditionally, it would come with an 18-round magazine.

13   Q    So your testimony is is that there's no store in Georgia

14   that ever purchases a weapon from the manufacturer with a

15   10-round magazine.  Is that your testimony?

16   A    My testimony is it would be extremely unlikely.

17   Q    Okay.  Well -- but it's possible.

18   A    Oh, of course it's possible.

19   Q    Right.  Okay.  So in this particular case we know that the

20   Canik TP9SF comes with either a 10-round magazine or an

21   18-round magazine, correct?

22   A    Depending what the store orders, yes.

23   Q    Okay.  When the time of purchase for this particular

24   weapon we don't know if they purchased it with a 10 round or an

25   18 round, correct?

Gilmore - Cross                                              42

 1  A    Not specifically, no.

 2  Q    Okay.  The third weapon that's on this list is a weapon

 3  that was recovered, was purchased by Fredrick Norman on

 4  November 4th of 2020.  Is that right?

 5  A    I don't know.  You didn't tell me what it was.

 6              MS. CINQUANTO:  May I approach, Your Honor?

 7              THE COURT:  For what purpose?

 8              MS. CINQUANTO:  May I approach?  I just want to show

 9  him the chart.

10              THE COURT:  Show counsel first.

11              MS. DESOUZA:  Okay.

12              THE COURT:  Yes.

13  Q    I'm talking about the last weapon that was recovered.

14  A    Oh, yes.

15  Q    Okay.

16  A    I know what you mean.

17  Q    All right.  Now, this weapon is the third weapon that was

18  recovered and it was purchased on November 4th of 2020.  Is

19  that right?

20  A    Yes, it was.

21  Q    And it's a Glock 19X?

22  A    Correct.

23  Q    Okay.  And this was recovered from Fredrick Norman.  Is

24  that right?

25  A    Yes.

Gilmore - Cross                              43

```
1   Q    And this was recovered from Fredrick Norman at the time of

2   his arrest, right?

3   A    He was not arrested, no.  Just interview.

4   Q    I'm sorry.  It was recovered where?

5   A    Just at the time of his interview, when we interviewed

6   him.

7   Q    At the interview.  Okay.

8   A    Uh-huh.

9   Q    And the interview was conducted on what day?

10  A    December 1st, 2020.

11  Q    Okay.  So Fredrick Norman purchased this weapon on

12  November 4th, 2020 and he purchased -- and had it on his person

13  in December, right?

14  A    Correct.

15  Q    Okay.  And that would lead you to believe that perhaps

16  Fredrick Norman was keeping this weapon for his own personal

17  use.

18  A    Yes.

19  Q    Okay.  And that then would not be considered a straw

20  purchase.

21  A    I don't think we ever argued that firearm is a straw

22  purchase.

23  Q    Well, it's in this list of high-capacity magazines that

24  Edwin Burgos is being held responsible for straw purchasing.

25  So my question to you is, is that -- should that be on the list
```

1  or not on the list?

2  A    I think that that list was originally generated just to

3  show firearms that had restricted magazines.  I -- I do not

4  contend that that gun was purchased by Fredrick Norman for

5  Fredrick Norman.

6  Q    Okay.  It was, right?  Correct?

7  A    Yes.

8  Q    And so, therefore, that particular gun should not be held

9  responsible with -- Edwin Burgos should not be held responsible

10 for that weapon.

11 A    I would not know.  I would not hold him responsible for

12 that firearm, no.

13 Q    Okay.  So when His Honor looks at Page 42 and he sees

14 these six weapons listed, he should be focusing on the top five

15 and not the last one.

16 A    Correct.

17 Q    Okay.  Okay.  Now, the other three weapons I want to talk

18 about -- so we just talked about the three that were recovered,

19 correct?

20 A    Uh-huh.

21 Q    One that was purchased prior to Edwin Burgos becoming

22 involved in the conspiracy, correct?

23 A    Uh-huh.

24 Q    That was the VMAC, correct?

25 A    Correctamundo.

1    Q    Okay.  The second is the Canik that was purchased by

2    Charles O'Bannon but can be purchased with a 10-capacity

3    magazine or an 18, correct?

4    A    Correct.

5    Q    All right.  And the third was the one that was recovered

6    is Fredrick Norman which we should just scratch off our list.

7    Okay.

8    A    Correct.

9    Q    Now, I want to turn His Honor -- your attention and His

10   Honor's attention to the other two weapons on this list.  We've

11   got a weapon that was purchased by Devin Church on

12   September 5th of 2020 and that the SAR USA.  Is that right?

13   A    The SAR USA is the brand, yes.

14   Q    Oh, okay.

15   A    I think it's a CM9.

16   Q    CM9.  CM9.  Okay.  And that gun was never recovered,

17   correct?

18   A    Not as of right now.

19   Q    Okay.  But we do know that that weapon can be sold as well

20   with a 10-capacity magazine or a 17-capacity magazine, correct?

21   A    Depending on what the -- the Federal Firearms Licensee

22   orders, yes.  They can order it to be sold with a 17 or a 10.

23   Q    Correct.  And we don't know in this particular case if it

24   was sold with a 17 or a 10.

25   A    No, we do not.

Gilmore - Cross                                46

1   Q    Okay.  And the last weapon on that list is the weapon that
2   was purchased on September 19th by Brianna Walker and that's
3   the SAR USA B6?
4   A    I don't know if that's the last -- I don't know if that's
5   the last one.  I'm not sure if the top one shows that there's a
6   second --
7   Q    Oh, you're right.
8   A    -- VMAC45 that was purchased --
9   Q    You're right.
10  A    -- on July 13th.
11  Q    Let me rephrase that.  That was confusing.  I apologize.
12       I want to turn our attention to September 19th, a purchase
13  by Brianna Walker of the SAR USA B6.  Okay?
14  A    Yes.  Uh-huh.
15  Q    Okay.  And that weapon was not recovered, correct?
16  A    Correct.
17  Q    And we know also that that weapon can be sold with a
18  magazine that holds 15 or 17 rounds, correct?
19  A    Correct.
20  Q    Okay.  And then I want to turn your attention and His
21  Honor's attention to October 7, 2020, the purchaser, Stephen
22  Norman, of the FN HFO [sic] 509?
23  A    Yep.
24  Q    Okay.  And that gun was never recovered, correct?
25  A    Correct.

1    Q    Okay.  But we also know that that gun can also be sold

2    with a magazine that has the capacity of 10 or 17, correct?

3    A    Depending what the FFL orders, yes.

4    Q    Okay.  And in this case, just to be clear, we don't know

5    if that -- we don't know which gun was ordered, correct?

6    A    When we spoke to -- any of the FFLs we spoke to in the

7    case said they would not order state-restricted magazines.

8    Q    Okay.

9    A    So in that case --

10   Q    Well, that --

11   A    -- no, we do not know specifically for that specific

12   firearm.

13   Q    Okay.  Well -- so I got a question for you.  I understand

14   that you're saying that you spoke with a lot of FFLs and they

15   specifically had that conversation with you.  My concern then

16   is that there's an exhibit that's been introduced into

17   evidence --

18        MS. CINQUANTO:  One moment, Your Honor.

19   Q    I believe it's Exhibit 3.  Exhibit 3.  Are you familiar

20   with Exhibit 3?

21        MS. CINQUANTO:  May I approach, Your Honor?

22        THE WITNESS:  Correct.  Yes, ma'am.  Uh-huh.

23   Q    Exhibit 3 is an ATF form that was prepared by you.  The

24   report number is 97.

25   A    Correct, ma'am.

Gilmore - Cross                                           48

1    Q    Was it prepared by you?

2    A    Yes, ma'am.

3    Q    Okay.  And in that report I do see that you had a

4    conversation with an FFL at City Pawn of Carrollton on July --

5    about a purchase on July 8th.

6    A    That's correct.

7    Q    Okay.  I don't see there being any reference to any other

8    type of weapons that were -- that you spoke to this dealer

9    about on that day.

10   A    Yes.  It was focused to the VMAC45.

11   Q    Okay.  So the report that we have from the conversation

12   that you had with an FFL, the only documented report that we

13   have is the one regarding the purchase of the VMAC45 on

14   July 8th of 2020 by Fredrick Norman.

15   A    That's correct.  Yes.

16   Q    Okay.  No other reports anywhere in this discovery about

17   conversations with FFLs about high-capacity magazines.

18   A    That's correct.

19   Q    And, in fact, you didn't even ask this guy about other

20   weapons that would be purchased with high-capacity magazines.

21   A    I don't -- may I see the exhibit, again?  I don't recall

22   if that true.

23          MS. CINQUANTO:  Yes, Your Honor.  May I approach with

24   Exhibit 3?

25          THE COURT:  Yes.

```
 1              THE WITNESS:  Thank you, ma'am.  I'm sorry.
 2   Q    Sure.
 3   A    It does not talk about specific firearms, but, yes, it
 4   does say the -- the -- Agent Gilmore asked about the business
 5   practice regarding the sale of firearms with reduced-capacity
 6   magazines that is firearms are sold with reduced-capacity
 7   magazines in order to be compliant with state-imposed
 8   restriction.  Mr. Blank stated that it was very uncommon for
 9   their store to sell firearms with reduced-capacity magazines
10   and they would not order new firearms with reduced-capacity
11   magazines because they are more difficult to sell in the State
12   of Georgia.
13   Q    We're talking about that FFL --
14   A    Correct.  Yes.
15   Q    -- regarding that specific weapon that was purchased on
16   July 8th of 2020, correct?
17   A    Well, that paragraph deals with their general business
18   practices, not specifically that firearm.
19   Q    All right.  Their general business practices, but those
20   are not the same FFL that sold the other weapons, correct, on
21   this list?
22   A    They sold the second VMAC45 --
23   Q    Okay.
24   A    -- on July 13th, as well.
25   Q    Well, the other second VMAC is not on this list.
```

1   A    I'm sorry.  Forgive me then.

2   Q    So this FFL did not sell any of these other weapons that

3   are on this list.

4   A    I don't -- I'm not positive of that.  I don't have the

5   records.  Is it listed on there what -- which one they were

6   sold at?  I don't want to say no and then I'm not sure.

7   Q    Well, we got a list of the purchasing -- the purchases

8   that were made as an exhibit so we can compare that.

9   A    Correct.  Yeah.  I'm just not positive.  I don't want to

10  give you an answer one way or another.

11         MS. CINQUANTO:  All right.  Thank you.  That's all I

12  have, Your Honor.

13         THE COURT:  Redirect?

14                   REDIRECT EXAMINATION

15  BY MS. DESOUZA:

16  Q    Agent Gilmore, defense counsel asked you about when Edwin

17  Burgos joined this conspiracy.  In the presentence report --

18  which you have not personally reviewed.  Is that correct?

19  A    Correct.

20  Q    Okay.  So the tables that she has referenced to you today

21  came from the presentence report, but, to be clear, the table

22  that I referenced in the direct examination with you I had

23  stated it was on Page 8 of the Government's sentencing

24  memorandum.

25         MS. DESOUZA:  That was actually an error, Your Honor.

Gilmore - Redirect                51

1  It's on Page 14.

2  Q    And those list different firearms that, based on your

3  review, were sold by the manufacturer and based on your

4  experience by the dealer with a high-capacity magazine.  Is

5  that true?

6  A    Correct.

7  Q    The presentence report describes --

8       MS. DESOUZA:  In Paragraph 27, Your Honor.

9  Q    -- about a communication between Fredrick Norman and

10 Brianna Walker back on June 16th, 2020.  Are you familiar with

11 that communication?

12      MS. CINQUANTO:  I'm sorry.  What page are we on?

13      MS. DESOUZA:  Page 9 of the presentence report.

14      MS. CINQUANTO:  Thank you.

15      MS. DESOUZA:  Paragraph 27.

16      MS. CINQUANTO:  Thank you.

17      THE WITNESS:  I believe so, yes.

18 Q    And you've reviewed all of the communications Fredrick

19 Norman had with his co-conspirators in this case?

20 A    Correct.

21 Q    I'm including that one on June 16, 2020, do you recall

22 when Fredrick Norman described how his cousins were down from

23 Philadelphia and that they were going to start a, essentially,

24 a firearms trafficking business?

25 A    A gun operation, yes.

1    Q    After knowing that communication on June 16th, 2020, did

2    you review whether there were any phone calls that were made --

3    any phone calls or communications made by Fredrick Norman after

4    on or about June 16th, 2020?

5    A    I believe so.

6    Q    And did you review, as described in the presentence

7    report, communications Fredrick Norman had with co-conspirators

8    that turned out to be identified as Charles O'Bannon, Devin

9    Church, his brother, Stephen Norman?

10   A    Yes.

11   Q    And did you understand that those were communications

12   where Fredrick Norman was recruiting others in Atlanta to join

13   him on the Atlanta side of the conspiracy?

14   A    Correct.

15   Q    Did you track -- or excuse me.

16        Did you then review communications --

17             MS. CINQUANTO:  Objection.  Leading, Your Honor.

18             MS. DESOUZA:  Your Honor, we're at sentencing.

19             THE COURT:  I understand.  Proceed.

20   Q    Agent Gilmore, did you, during the course of your

21   investigation, receive and review call detail records involving

22   Kenneth Burgos, Roger Millington, and Edwin Burgos, the

23   defendant?

24   A    I did.

25   Q    During the course of your investigation, did you identify

```
1    that those three people I just named, the defendant, Roger

2    Millington, and Kenneth Burgos, had been involved in a prior

3    conspiracy where they were convicted of offenses against a

4    school resource police officer?

5              MS. CINQUANTO:  Objection, Your Honor.

6              THE COURT:  Overruled.

7              THE WITNESS:  Yes.

8    Q    And were, in fact, Roger Millington and Edwin Burgos

9    convicted as co-conspirators in the aggravated assaults?

10   A    Yes, they were.

11   Q    Knowing that information when you reviewed the call detail

12   records, did you determine whether Kenneth Burgos and the

13   defendant talked over the phone?

14   A    Yes.

15   Q    Did you determine whether there existed calls between the

16   defendant and Roger Millington?

17   A    Yes.

18   Q    In reviewing that information, were you able to create a

19   summary of -- between those dates of early June prior to what

20   the defense has suggested was the date that Edwin Burgos joined

21   on July 12th, 2020 a summary of how many times the defendant

22   communicated with Roger Millington and Kenneth Burgos?

23   A    Yes.

24             MS. DESOUZA:  Your Honor, may I approach?

25             THE COURT:  Oh, did you --
```

1          MS. DESOUZA:  Yes.  I provided copies of these

2    exhibits, yes.

3          THE COURT:  Very well.

4          MS. CINQUANTO:  No objection, Your Honor.

5    Q    Agent Gilmore, I'm handing you what I've marked as part of

6    the record as Government's Sentencing Exhibits 5A and 5B.  Do

7    you recognize them?

8    A    I do.

9    Q    Are those the summary communications between the defendant

10   and Roger Millington on Exhibit 5A, and the defendant and

11   Kenneth Burgos in 5B?

12   A    That's correct.

13   Q    And were those generated based on the call detail records

14   that you received in the course of this investigation?

15   A    That's correct.

16   Q    Are they accurate numbers, to the best of your knowledge?

17   A    Yes, they are.

18         MS. DESOUZA:  All right.  Your Honor, may --

19         MS. CINQUANTO:  No objection.

20         MS. DESOUZA:  May they be accepted into the

21   sentencing records --

22         THE COURT:  Yes.

23         MS. DESOUZA:  -- as Exhibits 5A and 5B?

24     (Government's Exhibits 5A and 5B admitted into evidence)

25         MS. DESOUZA:  May I publish them, Your Honor, on your

 1  screen?

 2              THE COURT:  Yes.

 3              MS. DESOUZA:  Actually the -- okay.

 4              THE COURT:  Actually, don't I have them already?

 5              MS. DESOUZA:  Yes.  I was going to say, that may not

 6  be necessary.

 7              THE COURT:  Yes.

 8  Q    Agent Gilmore, if you can focus on 5A which I believe are

 9  the communications between the defendant and Roger Millington.

10  A    Yes.

11  Q    Does this summary try to describe communications between

12  the two from June 17th, 2020, through July 3rd, 2020?

13  A    It does.

14  Q    And based on your investigation and your review of the

15  records, were you aware that Roger Millington was, essentially,

16  kicked out of the conspiracy starting the first week -- or

17  starting the beginning of July of 2020?

18  A    Yes, he was.

19  Q    A moment ago you said that on June 16th is when Fredrick

20  Norman began communicating with who turned out to be his

21  co-conspirator, Brianna Walker, recruiter her into straw

22  purchasing.  In this case on June 17th, the next day, did that

23  start communications between the defendant and Roger

24  Millington?

25  A    Yes.

Gilmore - Redirect                          56

1   Q    You have totaled from June 17th to June 30th, so would you

2   agree that's approximately a two-week time period --

3   A    Correct.

4   Q    -- that the defendant and Roger Millington spoke

5   approximately 53 times.

6   A    Correct.

7   Q    In particular, on June 28th and June 29th, this chart

8   indicates that there were 11 calls on June 28th and 20 calls on

9   June 29th.

10  A    Correct.

11  Q    Based on your investigation, what was Roger Millington

12  doing from June 28th through June 29th?

13  A    I believe he was returning from Atlanta to Philadelphia

14  with a shipment of firearms.

15  Q    I want to turn your attention to 5B now.  That lists the

16  communications between the defendant and Kenneth Burgos.  Is

17  that correct?

18  A    Correct.

19  Q    And that shows that from June 24th to July -- excuse me,

20  June 24th to June 30th, that last week in June there were

21  approximately 52 phone calls between those two.

22  A    Correct.

23  Q    And, again, looking at June 27th and June 28th, June 27th

24  there were 26 calls.  Is that correct?

25  A    That's correct.

1    Q    June 28th there were ten calls?

2    A    Correct.

3    Q    And is this the same time period you referenced before as

4    when Roger Millington was traveling down to Atlanta to pick up

5    a shipment of firearms and returning to Philadelphia?

6    A    It is.

7    Q    Focusing in July, just that first week, from July --

8    beginning of July through July 11th, 2020, you record 76 phone

9    calls between the defendant and Kenneth Burgos.  Is that number

10   accurate?

11   A    Yes, it is.

12   Q    Focusing on July 6th and July 7th, you list 25 calls

13   between the two on July 6th.  Is that correct?

14   A    Correct.

15   Q    And 11 calls on July 7th?

16   A    Correct.

17   Q    Agent, based on your investigation, what was happening

18   during the conspiracy during those -- during that time period?

19   A    July 6th and July 7th is when Roger Millington, again,

20   returns from Philadelphia -- or from Atlanta to Philadelphia

21   with an order of firearms.

22   Q    Agent Gilmore, defense counsel spent a long time talking

23   about a text communication, contents between the defendant and

24   Fredrick Norman, and you agreed that the earliest communication

25   you see between the two of them was on or around July 12th,

 1  2020.  I believe you said July 11th, 2020.

 2  A    Correct.

 3  Q    But, again, focusing on other co-conspirators in this

 4  case, do you know who Ernest Payton is?

 5  A    Yes.

 6  Q    Is Ernest Payton a man that's been prosecuted as part of

 7  his role in transporting firearms in this case?

 8  A    Yes, he is.

 9  Q    Did you review communications between the defendant and

10  Ernest Payton where the defendant directs Ernest Payton when

11  and where to go to meet Fredrick Norman in Atlanta?

12  A    Yes.

13  Q    Were there numerous such communications?

14  A    Yes, there were.

15  Q    Do you recall the very first time that Ernest Payton is

16  tracked heading down to Atlanta to pick up firearms?

17  A    July 7th.

18  Q    The week leading up to July 7th, 2020, did you review

19  any -- did you review to see if there was any communications

20  between the defendant and Ernest Payton?

21  A    Correct.

22  Q    And did you determine that there was, in fact,

23  communications between the two of them?

24  A    Yes, there was.

25            MS. CINQUANTO:  What kind of communicating, could

```
 1   you --

 2   Q    What kind of communications, Agent?

 3   A    The Facetime calls.

 4   Q    And that would be video communications?

 5   A    Yes.

 6   Q    As part of your investigation, did you review cell phone

 7   records of Ernest Payton?

 8   A    I did.

 9   Q    Is that where you determined how many Facetime calls he

10   had with the defendant?

11   A    Correct.

12   Q    And, Agent, beginning on June 30th, 2020, did you

13   determine that the defendant made numerous Facetime calls

14   between June 30th and July 7th, 2020, which was, as you

15   described, the -- when Payton was traveling down to Atlanta?

16   A    July 7th is the first date, yes.

17   Q    And, specifically, did you determine on June 30th, 2020

18   that there were five Facetime calls between the two of them?

19   A    Correct.

20   Q    On July 3rd that there were three Facetime calls.

21   A    Correct.

22   Q    On July 6th that there was one Facetime call.

23   A    Correct.

24   Q    On July 7th that there was another Facetime call.

25   A    Correct.
```

1   Q    To be clear, Facetime is a live video conversation between

2   the two.

3   A    Correct.

4   Q    Would you agree with that?

5   A    Yes.

6   Q    So you do not know the contents of those communications?

7   A    No, we do not.

8   Q    But you said earlier that you did see numerous

9   communications between the two of them later on in your

10  investigation.

11  A    Yes.  That's correct.

12  Q    And your investigation showed that on July 7th through

13  July 8th, 2020, Ernest Payton was picking up firearms on behalf

14  of this conspiracy.

15  A    Yes, he was.

16  Q    Agent Gilmore, based on your review of the records that

17  you've summarized for the Court, both in 5A and 5B, as well as

18  the other records that you've described reviewing in this case,

19  did you see numerous communications between the defendant,

20  co-conspirator Roger Millington, co-conspirator Kenneth Burgos,

21  and co-conspirator Ernest Payton --

22  A    Yes.

23  Q    -- prior to July 12th, 2020?

24  A    Correct.

25  Q    Getting back to the firearms that defense counsel reviewed

1   with you, we had focused on July 8th, 2020, there being a

2   VMAC45 purchased in this case.

3   A    Correct.

4   Q    And you stated that a couple of days later on July 13th,

5   2020, there was another VMAC45 purchased.

6   A    Correct.

7   Q    The purchasing of the firearms in this case, the straw

8   purchased firearms, did you create a spreadsheet listing all of

9   the data associated with each of those purchases, each of the

10  gun dealers in this case?

11  A    I did.

12  Q    Has that been submitted to this Court as Government

13  Exhibit 1?

14  A    I believe so.

15  Q    Did you also create a spreadsheet containing all the data

16  that you were able to reference with regards to recoveries of

17  firearms in this case?

18  A    I did.

19  Q    And to your knowledge, has that been submitted to the

20  Court as Government Exhibit -- Sentencing Exhibit 2?

21  A    I believe so, yes.

22          MS. DESOUZA:  Your Honor, I believe there's no

23  objection to both Government's Sentencing Exhibit 1 and 2 to be

24  considered formally by this Court.

25          MS. CINQUANTO:  No objection.

 1        (Government's Exhibits 1 and 2 admitted into evidence)

 2   Q    Sir, there were two VMAC weapons that, as far as you know,

 3   were sold by the same gun dealer that you've described having a

 4   conversation with in this case.

 5        MS. CINQUANTO:  Your Honor, I would object to

 6   testimony regarding the second VMAC.  That's not part of the

 7   presentence --

 8        THE COURT:  Let's get the question first.

 9        MS. CINQUANTO:  Yes, Your Honor, but I -- yes.

10   Q    I'll back up.  You testified to July 8th, 2020 confirming

11   with the gun dealer that a VMAC was sold.

12   A    Correct.

13   Q    You had a conversation with that VMAC dealer as to that

14   dealer's position on selling reduced-capacity firearms as a

15   general business practice.

16   A    Correct.

17   Q    And what was that dealer's position?

18   A    That they would not order firearms with state-restricted

19   magazines because they're more difficult to sell.

20   Q    Based on your investigation that same dealer then sold

21   another VMAC45 to Fredrick Norman in this case.

22   A    That's correct.

23   Q    And that sale is documented at Government Sentencing

24   Exhibit 1?

25   A    It is.

 1              MS. CINQUANTO:  Your Honor, I would object to that

 2    testimony.  That is not part of the presentence investigation

 3    report.  The only high-capacity weapon that is included in the

 4    presentence investigation report is the one that was purchased

 5    on July 8th.

 6              THE COURT:  Ma'am, this is testimony at the

 7    sentencing.  You may cross-examine.  Overruled.

 8              MS. CINQUANTO:  Yes, Your Honor.

 9    Q    Agent Gilmore, you were saying that that same gun dealer

10    you documented and based on your investigation did, in fact,

11    sell another VMAC45 weapon a couple of days later on July 13th,

12    2020 to Fredrick Norman.

13    A    Correct.

14              THE COURT:  Ms. DeSouza, I'll remind you this is

15    redirect, though.

16              MS. DESOUZA:  Thank you, Your Honor.

17    Q    Agent Gilmore, based on your training and experience, as

18    an ATF agent and your experience -- excuse me, and your

19    knowledge of how federally-licensed firearms dealers act in

20    other states, this one being the State of Georgia, are dealers

21    in the State of Georgia likely to sell firearms with reduced

22    capacity or state-restricted magazines?

23              MS. CINQUANTO:  Objection, Your Honor.  Calls for

24    speculation.

25              THE COURT:  Overruled.

1            MS. CINQUANTO:  Also, it's been asked and answered.

2            THE COURT:  Overruled.

3            THE WITNESS:  Can you ask it one more time?  I'm

4    sorry.

5    Q    Based on your training and experience, are federally-

6    licensed firearms dealers in the State of Georgia likely to

7    sell reduced-capacity magazines or also considered state-

8    restricted magazines to their purchasers?

9    A    It would be very unlikely.

10   Q    Why?

11   A    Because they are more difficult for them to sell.

12           MS. DESOUZA:  Your Honor, no further questions with

13   regards to the issue of high-capacity magazines.

14           THE COURT:  Recross?

15           MS. CINQUANTO:  Briefly, Your Honor.  Very briefly.

16                       RECROSS-EXAMINATION

17   BY MS. CINQUANTO:

18   Q    Agent, you are aware that -- you testified about a number

19   of phone calls, not text messages, phone calls between Roger

20   Millington and Edwin Burgos between June 17th and July 3rd,

21   correct?

22   A    Correct.  We have no --

23   Q    Right.

24   A    -- data for text message communication between them.

25   Q    Right.  No text messages but there were phone calls,

 1  correct?

 2  A    Yes.

 3  Q    And you are aware that Roger Millington and Edwin Burgos

 4  are brothers.

 5  A    I am.

 6  Q    And you did not do an analysis into how many times Edwin

 7  Burgos and Roger Millington spoke prior to that, correct?

 8  A    I don't believe so.  I -- I -- I don't -- if -- if you

 9  want we could -- I mean we have the data for up to a certain

10  period but I'm not positive before then.

11  Q    My question -- yeah.  My question to you is this.  You

12  have no idea what the frequency in which those two brothers

13  spoke prior to June 17th of 2020, correct?

14  A    Correct.

15  Q    All right.  The same with Kenneth Burgos.  Kenneth Burgos

16  is the cousin of Edwin Burgos, correct?

17  A    Correct.

18  Q    And you talked about a number of phone calls that occurred

19  between those folks during a certain time period, correct?

20  A    Yes.

21  Q    And these are phone calls, these aren't text messages,

22  correct?

23  A    Correct.

24  Q    All right.  And the -- again, same question.  You have no

25  idea what the frequency that these -- that Kenneth spoke with

Gilmore - Recross                                66

1   his cousin, Edwin, prior to that time period.

2   A    Not off the top of my head.  We'd have to go back to the

3   records and track.

4   Q    Correct.  And we don't -- you didn't do that analysis,

5   correct?  So we don't --

6   A    I don't --

7   Q    -- know the frequency, correct?

8   A    Correct.  Not off the top of my head.

9            MS. CINQUANTO:  All right.  All right.  Your Honor,

10  one moment.

11  Q    And regarding --

12           THE COURT:  This is recross, ma'am.

13           MS. CINQUANTO:  Uh-huh.

14           THE COURT:  It's recross.

15           MS. CINQUANTO:  Yes, sir.  I'm going to keep it

16  short.  I'm almost done.

17           THE COURT:  You said that when you came up.

18           MS. CINQUANTO:  Yes, sir.

19  Q    But briefly, regarding Ernest Payton.  Ernest Payton.  You

20  don't know the relationship between Ernest Payton with Kenneth

21  Burgos, do you?

22  A    Not at all.

23  Q    No.  Because Ernest Payton wouldn't talk to you, right?

24  A    No, he would not.

25  Q    And neither would Kenneth Burgos, correct?

1  A    No, they did not.

2  Q    Okay.  So you're not aware if these two gentlemen are

3  neighbors, friends, et cetera?

4  A    Between where -- where Ernest Payton lives is nowhere near

5  where Kenneth Burgos lives.

6  Q    Okay.  Well, do you have any idea what the relationship is

7  between Kenneth Burgos and Ernest Payton?

8  A    No, they never communicated at all.

9  Q    Okay.  But you don't know what the relationship is between

10  the two men.

11  A    Correct.

12  Q    Okay.  And finally regarding the sale of this -- on

13  July 8th and then again on July 13th, during that time period

14  there are numerous text messages between Kenneth Burgos and

15  Fredrick Norman where they are ordering weapons and they are

16  arranging for the pickup of weapons, correct?

17  A    Yes.

18  Q    Is that right?

19  A    Uh-huh.

20  Q    Okay.  That would include the time period in which these

21  two VMACs were purchased, correct?

22  A    Yes, it would.

23  Q    All right.  And, again, not to belabor this point, but

24  there is no text messages involving Edwin Burgos until after

25  July 8th, correct?

1    A    Correct.

2           MS. CINQUANTO:  All right.  All right.  Thank you,

3    Your Honor.  I have nothing further.

4           THE COURT:  Very well.  The Government's burden in

5    this matter is by a preponderance of the evidence, not beyond a

6    reasonable doubt.  The Court finds that the Government has met

7    its burden, which is by a preponderance of the evidence, more

8    likely than not.  The objection is overruled.  Let's move to

9    the next one.

10          MS. DESOUZA:  Your Honor, may I proceed with

11   testimony in support of the leadership enhancement?

12          THE COURT:  Proceed.

13                 FURTHER REDIRECT EXAMINATION

14   BY MS. DESOUZA:

15   Q    Agent Gilmore, did you review text messages between the

16   defendant and Fredrick Norman?

17   A    I did.

18   Q    Did you also review text messages between Fredrick Norman

19   and Kenneth Burgos?

20   A    I did.

21   Q    Were you able to calculate approximately how many messages

22   Fredrick Norman had with each of these men?

23   A    Yes.

24   Q    With regards to the number of times Fredrick Norman

25   communicated via text message with Kenneth Burgos, would you

1    agree with me that that number was approximately -- well,

2    actually, do you remember the number?

3    A    Is it 147?

4    Q    Well, does 157 sound accurate?

5    A    Yes, it does.

6    Q    With regards to the number of text messages that the

7    defendant had with Fredrick Norman, does the number 2,066 sound

8    accurate?

9    A    It does.

10   Q    And you, by the way, have reviewed each one of these

11   messages?

12   A    I have.

13   Q    And that was based on the cell phone record that was

14   extracted from Fredrick Norman's phone?

15   A    Fredrick Norman's iCloud.

16   Q    Would you agree with me that those 2,000 messages are more

17   than 500 pages of documents?

18   A    Yes, they are.

19   Q    These 2,000 messages were during the course of the

20   conspiracy?

21   A    Yes, they were.

22   Q    And do you agree with me that the messages stopped --

23   excuse me, that the messages started, as we've established,

24   around July of 2020?

25   A    Correct.

1  Q    And the messages ended at the very end of November 29th,

2  2020.

3  A    Correct.

4  Q    And would that have been two days prior to the ATF,

5  yourself included, going down to Atlanta to disrupt the

6  trafficking, the flow of firearms up to Philadelphia?

7  A    Correct.

8  Q    Besides the text messages, were there also voice messages

9  that the defendant sent to Fredrick Norman?

10  A    There were.

11  Q    And you reviewed those, as well?

12  A    Yes.

13  Q    Did you review a message that the defendant sent to

14  Fredrick Norman on September 11th, 2020?

15  A    I have.

16  Q    And did you transcribe that message?

17  A    I did.

18  Q    I mean, generally speaking, before getting into a couple

19  particular messages for the Court's review, during the course

20  of this approximately five-month time period throughout these

21  thousands of messages, did the defendant direct Fredrick Norman

22  as to what types of guns to purchase?

23  A    He did.

24  Q    Did he explain to Fredrick Norman how many guns he wanted

25  purchased?

```
 1   A     Yes.

 2   Q     Did he negotiate with Fredrick Norman as to the cost of

 3   these guns?

 4   A     Yes, they did.

 5   Q     During certain times, did the defendant tell Fredrick

 6   Norman that he was sending down people to pick up firearms from

 7   him?

 8   A     Yes, he did.

 9   Q     And did he describe the people as being, quote, "my guy"

10   end quote?

11   A     Yes.

12   Q     Or, quote, "my transporter" end quote?

13   A     Yes.

14   Q     Did he also tell Fredrick Norman on numerous occasions

15   that there was money that was going to be transferred to him

16   through Apple -- excuse me, through Apple Pay or iCloud or

17   Walmart-to-Walmart transfer, as examples?

18   A     Yes.

19   Q     And you -- he actually used those terms, Walmart to

20   Walmart?

21   A     Yes, he did.

22   Q     And did he describe who was sending those -- who Fredrick

23   Norman should expect to receive that money from?

24   A     Yes, he did.

25   Q     And can you give us some examples as to who it was that he
```

 1  said money was being transferred down to Fredrick Norman?

 2  A    Brianne Reed, Shawnie Coleman (phonetic), Branshal Backus

 3  (phonetic), Maria Burgos, Roselmy Rodriquez.

 4  Q    But to be clear, he never said to Fredrick Norman the

 5  names that you just mentioned.  Is that fair to say?

 6  A    He said Branshal Backus by name.

 7  Q    With regards to the other ladies that you referenced.

 8  A    My girl, my girl, my lady, stuff like that.

 9  Q    Did you review records from Walmart to Walmart, a cash

10  app, or other money remitting services?

11  A    We did.

12  Q    The times that he would say my girl or language like that

13  would be sending money, did you correspond that communication

14  with money being actually sent to Fredrick Norman?

15  A    Correct.

16  Q    Agent Gilmore, did you pull out some of the text messages

17  out of those 2,000 messages for the Court to review that the

18  defendant sent to Fredrick Norman?

19  A    I did.

20         MS. DESOUZA:  Your Honor, may I just play some of

21  those messages for the Court?  These messages have previously

22  been provided to defense counsel, as well.

23         THE COURT:  Certainly.

24  Q    All right.  Agent Gilmore, do you see on your screen?  Do

25  you have a screen?

1    A    I do now but it isn't on.  Yes.

2    Q    Do you see on your screen a slide that you prepared that's

3    labeled July 27th, 2020, text messages?

4    A    Correct.

5    Q    Can you explain to the Court what it is that you've

6    extracted from your investigation here?

7    A    So this is a text message exchange between Edwin Burgos

8    and Ernest Payton.  During it Edwin says, "My Cuzzo (phonetic)

9    read -- might be ready for you SMH."  Payton says, "Our bet,

10   5847 North Broad Street, address, LOL."  That corresponds to an

11   Enterprise Rent-a-Car.  Burgos tells -- then tells him to go to

12   932 Granite Street which is next door to another person's

13   address of record.  Payton says, "Say less, LOL.  We on that

14   mission tonight."  And Burgos says, "Or you take 3K, I take 2,

15   and we split profit off of the last one.  I still -- you owe

16   2K, bro, bro."  Payton says, "I'm going to call you as soon as

17   John leave for real."  And then he -- on that date Burgos and

18   Payton communicate via Facetime 19 times.

19   Q    Based on your investigation, did Ernest Payton then head

20   down to Atlanta, Georgia?

21   A    Yes, he did.

22   Q    I'm going to direct your attention to text messages from

23   October 29th, 2020.  Do you see that slide?

24   A    Yes, I do.

25   Q    Can you explain what is it -- what was communicated

```
 1   between Fredrick Norman that day --

 2   A    This --

 3   Q    -- to Fredrick Norman that day?

 4   A    This is a text message between Fredrick Norman and Brianna

 5   Reed's phone number.  Reed states, "This Rock, Cuzzo."  Rock we

 6   know is a nickname for Edwin Burgos.  Norman says, "Which cash

 7   app do you want to send it to?"  And then sends a screenshot of

 8   a cash account Brionsay20 (phonetic)," which has her picture in

 9   it and when we did cash app records it comes back to her.

10   She's the owner of that account.

11   Q    And did you speak to Brianna Reed in this case?

12   A    We did.

13   Q    And did she confirm that she sent money down through a

14   cash app and other ways to Fredrick Norman?

15   A    Yes.

16   Q    And did she say why she sent it down?

17   A    Because Edwin Burgos asked her to.

18   Q    At times that she sent money down, were you able to see

19   the what's considered a memo line for some of the transactions?

20   A    Yes, we were.

21   Q    And did you see that on some of the transactions the memo

22   line read things like Rock, for Rock, or Rocky's supplies?

23   A    Yes.

24   Q    And that's based on your review of the cash app records?

25   A    It is.
```

1   Q    Did Brianna Reed also describe being asked by the

2   defendant to travel down with him to Atlanta to pick up

3   firearms?

4   A    Correct.

5   Q    And was one of those times on October 29th, 2020?

6   A    Yes, it was.

7   Q    And does this slide that's labeled October 29th, 2020,

8   vehicle stop, describe what happened during that transport?

9   A    It does.

10  Q    What do you state here?

11  A    So on October 29th, 2020, approximately 2:13 a.m., we're

12  driving southbound on I-81.  Brianna Reed and Edwin Burgos were

13  stopped by Virginia State Police for driving over the speed

14  limit.  They were subsequently interviewed by the officers and

15  Brianna Reed stated that she and Edwin Burgos were in a

16  romantic relationship, and they were traveling to Atlanta,

17  Georgia for a boxing match.  Edwin stated the vehicle, a 2020

18  Nissan Sedan bearing PA registration LFV9438 was a rental, and

19  it was rented by Shawnie Coleman.  Edwin Burgos said he was

20  traveling to Atlanta, Georgia to participate in a boxing match.

21  Q    And is Shawnie Coleman somebody that you noted sent money

22  down to Fredrick Norman during the course of this conspiracy?

23  A    Just shy of $20,000.

24  Q    Agent, you also pulled out a text message from

25  September 4th, 2020.  So this now is a couple of months into

1  the conspiracy.  Do you agree with that timeline?

2  A    Yes.

3  Q    In that text message, which is labeled September 4th,

4  2020, firearms ordered, money transferred, does the defendant

5  at some point tell Fredrick Norman that he states, quote, "13,

6  my bad?"

7  A    Yes.

8  Q    And Norman states in response, "You didn't want to do 15,

9  but I" --

10  A    Yes.

11  Q    And then there's an IM message that was sent.  What does

12  defendant say?

13  A    "I'm not trying to wait too long, that's the only thing.

14  Once I send the bread in tomorrow to you depending on how you

15  can maneuver then you know what I mean and we can go from

16  there, but that 13 slot should be cool, that 13 should be cool

17  unless you can maneuver it, depends on the timing, that's all

18  I'm trying to, you know."

19  Q    And at some point Burgos says, "4950 coming to account."

20  Is that correct?

21  A    Yes, it is.

22  Q    And later on in that message the defendant again sends

23  another audio message describing that, quote, "My

24  transporter" --

25  A    Correct.

1  Q    -- is in this.

2  A    Yes, it is.

3  Q    All right.  And is that one of those examples you said

4  where he described dispatching people down to Atlanta?

5  A    Yes.

6  Q    That number 4950, did you later determine that that was

7  the same number -- same amount of money that was transferred

8  from Shawnie Coleman via a cash app down to Fredrick Norman?

9  A    Yes, it was.

10 Q    And you also indicate here that the defendant himself was

11 sending cash -- excuse me, sending money directly to Fredrick

12 Norman, as well.

13 A    Yes.  Over $20,000 throughout the case.

14 Q    So besides Shawnie Coleman and the defendant, you

15 identified a woman name Branshal Backus is also sending -- or

16 excuse me, $19,200.

17 A    Correct.

18 Q    Looking at the text message, the slide that says

19 September 18th, 2020, text messages and money transferred.  You

20 indicate here that on September 18th, 2020, Ms. Backus sent

21 $2,500 using Walmart to Walmart and $3,500 using Apple Pay down

22 to Fredrick Norman.  Is that correct?

23 A    Yes, it is.

24 Q    And on that same date you also describe a text

25 communication that you reviewed where the defendant sent

```
 1   Fredrick Norman a -- you describe in here as a Walmart-to-

 2   Walmart receipt.  Is that a photograph of the same transfer of

 3   money by Ms. Backus?

 4   A    It is.

 5   Q    And during that communication, the defendant specifically

 6   states, my lady, name, Branshal Backus, to the defendant.

 7   A    Yes, it does.

 8   Q    Excuse me, to Fredrick Norman.

 9   A    Correct.

10   Q    You mentioned that Roselmy Rodriquez sent $13,800 down to

11   Fredrick Norman on behalf of the conspiracy.  Is that right?

12   A    Correct.

13   Q    And is that based on the records that you saw of

14   Ms. Rodriquez's transfers?

15   A    Yes, it is.

16   Q    Is it also based on conversations you had with

17   Ms. Rodriquez?

18   A    Yes.

19   Q    Did she identify sending money on behalf of the defendant

20   at his direction?

21   A    Yes, she did.

22   Q    Did she also identify opening up a bank account at the

23   behest of the defendant for the purpose of also transferring

24   money?

25   A    Yes, she did.
```

1    Q    During the course of your investigation, were you aware

2    that the defendant was briefly arrested for violating his

3    probation?

4    A    Correct.

5    Q    And he was incarcerated?

6    A    Yes, he was.

7    Q    During that time period, did you determine whether he made

8    phone calls from prison to Roselmy Rodriquez?

9    A    He did.

10   Q    Did you review those conversations?

11   A    I did.

12   Q    And at the beginning of that -- excuse me.  Moving you now

13   to the slide that's labeled October 16th, 2020, prison call.

14   Is that one of the conversations that the defendant made from

15   prison to Roselmy Rodriquez?

16   A    It is.

17   Q    And is that one of the first conversations?

18   A    Yes.

19   Q    In that conversation, did the defendant says, "Listen,

20   baby, baby, fuck all that.  Okay.  You in charge of everything

21   right now, baby.  Okay?"

22   A    Yes.

23   Q    And does he continue on to say, "You know how my shit

24   runs.  I told you everything.  You stay with me, you know how

25   it go.  I need you to make sure Ern get your number."

 1  A    Correct.

 2  Q    "And my line, get your number."

 3  A    Correct.

 4  Q    And then just --

 5         THE COURT:  Quiet, please.  Excuse me.  You all could

 6  take that outside.

 7         Continue.

 8  Q    Agent Gilmore, that term, my line, did you see that

 9  elsewhere as being statements made by the defendant?

10  A    Yes.

11  Q    Where else did you see it?

12  A    It was in all of the prison -- or prison calls and text

13  messages, audio calls.

14  Q    Okay.  And based -- and we'll review that same call, but

15  based on your review of all of the prison calls in this case,

16  what was the defendant referring to when he said my line?

17  A    His -- his Atlanta connection to firearms, Fredrick

18  Norman.

19  Q    On this same communication it ends with Mr. Burgos

20  describing different numbers.  "You take out five, put up --

21  put the five up to you, you take two out of the five, put the

22  three on my books every week, the other -- the other eight

23  grand.  He going to give eight this time.  Tell him the other

24  two got to go to O.G."

25  A    Correct.

1   Q    Did you speak to Ms. Rodriquez about this message?

2   A    Yes.

3   Q    And did she explain to you what she did with cash that she

4   received from other co-conspirators in this case?

5   A    She did.

6   Q    What did she say?

7   A    She received cash from Ernest Payton, some of it she gave

8   back down to him, some of it she sent to Fredrick Norman.

9   Q    How did she know where to send it?

10  A    She was --

11  Q    Excuse me.  How did she know what to do with the money?

12  A    Because he told her to.

13  Q    The defendant, you mean?

14  A    Correct.

15  Q    Okay.  I'm moving you now to October 20th, 2020, the

16  prison call between the defendant and Roselmy Rodriquez and

17  Ernest Payton also joins the line.  Is that correct?

18  A    Yes, it is.

19  Q    How did that happen?  Based on your investigation, how do

20  you know what happened?

21  A    Edwin calls his phone -- his phone number because when

22  he's arrested Roselmy Rodriquez keeps his personal phone.  He

23  calls his phone, Roselmy calls Ernest Payton on her phone and

24  that way they can talk to each other without leaving a record

25  on his prison call sheet.

1    Q    Did you review more than one conversation where the

2    defendant is communicating with Ernest Payton with the help of

3    Roselmy Rodriquez?

4    A    Yes.

5    Q    From prison, I mean.

6    A    Correct.

7    Q    Okay.  So in this case, on October 20th, 2020, what the

8    conversation?

9    A    Payton says, "But you know I just -- now -- now the shit

10   it's still -- I just -- like at first I wasn't tripping.  I'm

11   like, yo, shit is what it is, but, you know, some things were

12   said.  That just made me think, but I never asked for the bull

13   number.  I never wanted the bull number, but --"

14        And Burgos says, "Right.  That's why -- that's why I said

15   I understand it now."

16        Payton said, "If I did -- no, no, I'm saying if I -- no,

17   I'm saying if I did, could you explain why it would be a

18   problem."

19        And Burgos says, "Say it again.  If you did what?  If you

20   did why would it be a problem?"

21        Payton says, "I said, yeah, yeah.  I -- I never did but

22   I'm saying if I was to, why would that be a -- why would it be

23   a problem?"

24        Burgos says, "Why would it be problem if he got my line

25   number?"

 1          And Rodriquez chimes in, "Exactly."

 2          And Burgos says, "Because that's my line.  People get

 3    killed for shit like that, bro.  That -- that's why.  Like

 4    honestly speaking that's why."

 5          Rodriquez says, "That's what I'm saying.  I know I wasn't

 6    tripping."

 7          Payton:  "No, no, no, people don't get killed for

 8    having --"

 9          Burgos:  "Yes, they -- yes, yes, they do."

10    Q    Based on your -- the communications, up until that time,

11    October 20, 2020 when the defendant is incarcerated, had the

12    defendant ever shared the phone number of Fredrick Norman with

13    anybody else in the conspiracy?

14    A    Not to my knowledge.

15    Q    Sticking with the conversations that the defendant had

16    with Fredrick Norman, in particular, you pulled out one from

17    August 19th, 2020, which is labeled "text messages firearms

18    order."  Agent Gilmore, just generally speaking, were there

19    numerous times where the defendant explicitly ordered make,

20    model, and the amount -- the quantity of guns that he wanted

21    Fredrick Norman to obtain for him?

22    A    Correct.

23    Q    On August 19th, 2020, is this an example of the statements

24    that the defendant made to Fredrick Norman?

25    A    It is.

1    Q    Okay.  And could you read that into the record, please.

2    A    On August 19th, Fredrick Norman engaged in a text message

3    conversation with Edwin Burgos.

4         Burgos:  "Getting everything together still, Cuzzo?"

5         Norman:  "Bet."

6         Burgos:  "And nobody likes a sky brand.  Please don't get

7    none of those.  Just M&P and Taurus, but next hour I'll have it

8    sent."

9         Norman:  "All right."

10        Screenshot of this cash app account.

11        Burgos:  "You still get Zelle?"

12        "Yes;" sends his Zelle account.

13        Burgos:  "Sure it's safe to send there?"

14        "Yeah, it's legit."

15        Burgos:  "Okay.  How long is it going to take for this --

16   this ten.  I'm sending on Zelle now?"

17        Norman:  "Bet.  And give me four days at most, Cuzzo.  I'm

18   trying to do it right, play it smooth."

19        Burgos:  "Bro, not waiting four days, bro.  Real shit --

20   or our ass real shit.  Two, three tops, man."

21        Norman:  "Three days then at the most, thern (phonetic) --

22   then."  He corrects himself.

23        Burgos:  "Yes, bro.  You need to get on by like it was

24   when we first started.  It's a lot of money to be made, bro.

25   This you draw on."

1        Screenshot of the Zelle account and then Burgos sends an

2    audio message:  "Things is getting situated right now.  The

3    person I had sending the money out their account is over the

4    limit for the week, so I have to send it through my girl

5    account tomorrow morning.  So we definitely going to do.  We

6    understand the three to four days.  We just need the job done.

7    That's all, bro.  Appreciate you.  We'll send the money

8    tomorrow in the morning."

9    Q    Based on your review of the messages, the defendant -- did

10   the defendant state on other occasions specific type of guns

11   that he wanted ordered?

12   A    That's correct.  He did.

13   Q    At some point, did the -- or were there points in the

14   communications between the defendant and Fredrick Norman where

15   the defendant was arguing over how much money Fredrick Norman

16   wanted to charge him for obtaining these guns?

17   A    Correct.

18   Q    And at some point, did the defendant send a voice

19   communication to Fredrick Norman, essentially, calling off the

20   conspiracy?

21   A    That's correct.

22   Q    I'm showing you September 11th, 2020, text message slide.

23   Is that the communication that you've been talking about?

24   A    Yes, it is.

25   Q    On that date, does the defendant state, "How we looking

1  and we need one more of the 450, then I can go up to 550,

2  Cuzzo, if you can.  I'll go up with you but you need to -- you

3  need another at 450, then we can go up, Cuzzo.  I need to make

4  what I'm spending, then we can take it to 550."  Is that

5  correct?

6  A    Yes.

7  Q    Does Norman describe about how another person's -- one of

8  his associates is bringing him the last three firearms, and

9  then they -- and then Norman describes about, "I said I was

10 going up to 300.  It's strapped for me to work.  I can't do

11 250."

12 A    Yes.  The conspiracy moves along.  Fredrick Norman charges

13 more and more money down the line and that causes a lot of

14 arguments.

15 Q    And in this case defendant's response is, "Okay.  Well, we

16 shutting down after this.  I'm not going to be making 150, 200

17 off the strap, bro.  At this point, you're being greedy,

18 Cuzzo."  Is that correct?

19 A    Yes, it is.

20 Q    And then he then sends a message to the defendant.  And

21 you reviewed that message?

22 A    I have.

23        MS. DESOUZA:  Your Honor, may I play that message?

24 It's also transcribed in that same --

25        THE COURT:  Yes.

 1          MS. DESOUZA:  -- slide.

 2               (Audio played at 11:55 a.m. to 11:57 a.m.)

 3          MS. DESOUZA:  Your Honor, may that voice message that

 4    was played for the record and is transcribed be entered into

 5    the evidence, Government's Sentencing Exhibit 6?

 6          THE COURT:  Certainly.

 7               (Government's Exhibit 6 admitted into evidence)

 8    Q    Agent, we just reviewed a message from September 11th,

 9    2020, where the defendant appears to be calling off the

10    conspiracy.  Did you determine that a couple of days later the

11    defendant proactively reaches back out to Fredrick Norman and

12    asked if he could order some more guns?

13    A    Correct.

14    Q    And did these messages continue up until that date that

15    you referenced on November 29, 2020?

16    A    Correct.

17    Q    Going towards the end of the conspiracy now, at some

18    point, did you determine that the defendant sent a message to

19    Fredrick Norman with regards to Ernest Payton?

20    A    That's correct.

21    Q    And Ernest Payton is someone you've identified as a person

22    who made numerous trips down to Atlanta during the course of

23    the conspiracy to bring firearms back?

24    A    That's correct.

25    Q    And in that case, do you recall a message from

1    November 21st -- on or about November 21st, 2020, through

2    November 22nd, 2020 a conversation over text message between

3    the defendant and Fredrick Norman about Ernest Payton?

4    A    Yes.

5    Q    And on that date that -- on that date range, did the

6    defendant send a message to Fredrick Norman directing him to,

7    quote, "I'm going to need you to change your," and then the

8    number sign, "to Cuzzo whenever you get the chance.  It's

9    important.  Earn," spelled E-A-R-N, "not to be trusted at all.

10   There's too weird shit --" or excuse me.  S-H-T -- "coming --

11   keeps surfacing with him so he's cutt," spelled C-U-T-T,

12   exclamation point, exclamation point. "But HMU when you get

13   up."  Do you remember that?

14   A    I do.

15   Q    And based on your review of the communications, what does

16   HMU mean?

17   A    Hit me up.

18            THE COURT:  Ms. DeSouza, I'm going to have to break

19   now.  It's noon now.  I have another hearing that starts in a

20   half hour, but we're going to push that to 12:45.  We'll resume

21   here at the sentencing at two o'clock.  All right.

22            MS. DESOUZA:  Thank you.

23            THE CLERK:  All rise.

24                  (Recess taken at 11:59 a.m.)

25                  (Proceedings resumed at 2:02 p.m.)

```
1              THE COURT:  Please be seated.  Okay.  Guest of honor.

2              Ms. Scott, if necessary, can you pull up the last

3   question that was asked?

4              Agent, would you mind retaking the witness stand?

5              THE WITNESS:  Yes, sir.

6              THE COURT:  I just asked the deputy if she could pull

7   up the last question that was asked and the answer, of course.

8              THE COURT REPORTER:  The phone recording was being

9   played.

10             THE COURT:  I'm sorry.

11             THE COURT REPORTER:  The phone recording was being

12  played.

13             THE COURT:  Was that the last thing that was--

14             THE COURT REPORTER:  Yes.

15             THE COURT:  The phone recording?

16             THE COURT REPORTER:  Yes.

17             THE COURT:  And there were no other questions after

18  that?  In other words, did I break for lunch right after that?

19             THE COURT REPORTER:  Yeah.  That was at --

20  Ms. DeSouza said, based on your --

21             THE COURT:  Ms. DeSouza, do you remember where you

22  were at?

23             MS. DESOUZA:  Yes, Your Honor.  I think I ended with

24  a slide where the defendant indicated that Ernest Payton was to

25  be no longer be part of the conspiracy to Fredrick Norman.
```

 1              THE COURT:  If you know where you were at and she's

 2   been trying to pull up the last one, but if you'd like to

 3   proceed you can.

 4              MS. DESOUZA:  Thank you, Your Honor.

 5   BY MS. DESOUZA:

 6   Q    I'm pulling up that last slide just to reorient

 7   Agent Gilmore.  That was the slide that indicated that back on

 8   November 21st -- on or around November 21st, 2020, the

 9   defendant sent a text message to Fredrick Norman, wherein he

10   stated things including, "Earn not to be trusted at all, was

11   too much weird shit keep surfacing with him so he's cutt,"

12   exclamation point, exclamation point, "But HMU", which you

13   identified as being hit me up, "when you get up."  Is that

14   accurate?

15   A    Yes, it is.

16   Q    Agent Gilmore, I want to bring you back to another slide

17   that you created where the defendant sent another text

18   communication with regards to Ernest Payton earlier on in the

19   conspiracy.  This text was from November of 2020.  I want to

20   bring you back now to July of 2020.  Do you see the slide that

21   says July 28th, 2020, defendant and Payton?

22   A    I do.

23   Q    Is this a text conversation between the defendant and

24   Fredrick Norman?

25   A    That's correct.

1  Q    Can you read what the conversation was on July 28th, 2020?

2  A    Burgos:  "Yo, Cuzzo."

3       Norman:  "What's going on, Cuz?"

4       Burgos:  "My guy getting ready to slide out."

5       Norman:  "Bet, I'm ready."

6       Burgos:  "Cool.  One thing, I might have to send him wait

7  to a.m. so I would just send him in the morning."

8       Norman:  "Bet."

9  Q    When you saw the word "my guy," did you see any movement

10 on the selfsame data with regards to Ernest Payton after this

11 message was sent?

12 A    Yes.

13 Q    What did you see?

14 A    He began to travel south to Atlanta.

15 Q    Did you also then continue to see communications between

16 the defendant and Fredrick Norman where the defendant had

17 relayed what his guy -- what the movements of Payton was?

18 A    That's correct.

19 Q    During the course of your investigation, did you determine

20 whether Ernest Payton had ever communicated with co-conspirator

21 Kenneth Burgos?

22 A    He did not.

23 Q    What about Ernest Payton communicating with Roger

24 Millington?  Did you ever come across a text communication

25 between those two?

```
 1  A    No.

 2  Q    You also mentioned this morning about Brianna Reed,

 3  another uncharged co-conspirator in this case, and we reviewed

 4  a slide where her phone -- where the defendant identified

 5  himself using her phone to send money down via a cash app.

 6  A    Correct.

 7  Q    Do you recall that?

 8  A    I do.

 9  Q    Did you determine that Brianna Reed had also opened a bank

10  account for the purpose of funneling money down to Atlanta?

11  A    That's correct.

12  Q    And was that based on Ms. Reed's statement to you?

13  A    Correct.

14  Q    Did you determine that there were other occasions where

15  Ms. Reed used the cash app or other money remitting companies

16  to transfer funds down to Fredrick Norman or the other

17  co-conspirators in Atlanta?

18  A    That's correct.

19  Q    And according to Ms. Reed, whose money was she

20  transferring?

21  A    Edwin Burgos.

22  Q    You mentioned this morning that Ms. Reed and the defendant

23  traveled together at the end of October of 2020 down to pick up

24  firearms and that they had been stopped by Virginia State

25  Police.  Do you recall that testimony?
```

1  A    I do.

2  Q    Did Ms. Reed travel with the defendant on another occasion

3  after that for the same purpose of picking up firearms?

4  A    Yes, she did.

5  Q    Did Ms. Reed also indicate that -- indicate to you that

6  the defendant asked her to accompany another woman down to

7  Atlanta for the purpose of picking up firearms from Fredrick

8  Norman?

9  A    That's correct.

10 Q    And on all three of these occasions Ms. Reed confirmed

11 that firearms were, in fact, picked up and transported across

12 state lines back to Philadelphia?

13 A    Correct.

14 Q    Agent Gilmore, I'm showing you a slide I've marked as

15 July 23rd, 2020, defendant's recruitment of quote, "Liz" L-I-Z.

16 Do you see that?

17 A    Yes.

18 Q    Can you indicate what that slide represents?

19 A    So there's some cash app records that show that Liz sent

20 $350 to Fredrick Norman.  On the same day they engage in a text

21 message conversation with Norman where Norman says, "Somebody

22 named Liz just went $300 -- $350.  That's from you?"

23     Burgos:  "That my lady, my babe mom."

24     Norman:  "All right, bet."

25     Burgos:  "I'm sending the rest now trying to -- I'm

1  sending the rest now trying to handle it now, 850 to go.  All

2  right."

3  Q    Agent Gilmore, based on your role as the investigator in

4  this case, did you determine why there were so many different

5  people involved in transferring the money down to Fredrick

6  Norman?

7  A    Some of the payment apps, cash app, Apple Pay, they get

8  maxed out at a certain period of time, so you would have use

9  multiple different ones to be able to send that large a volume

10 of money.

11 Q    And in this case, the person Liz that sent $350 that the

12 defendant referenced as my lady, my babe mom, is that person

13 different from the other women that you identified this morning

14 as being requested by the defendant to transfer munds --

15 A    That's correct.

16 Q    -- funds.  Excuse me.

17 A    Yes.

18 Q    Agent Gilmore, I bring you now to the next slide, which is

19 entitled November 29th, 2020, defendant's last text message.

20 Is this the last communication between the defendant and

21 Fredrick Norman in terms of text message?

22 A    It is.

23 Q    And is that from November 29th, 2020?

24 A    Yes, it is.

25 Q    And can you read -- it starts off it looks like with an

1   audio message that was sent by the defendant to Fredrick

2   Norman?

3   A     Yes.

4   Q     Can you please read it into the record?

5   A     Burgos:  "Yo, Cuzzo.  I was trying to see where's the

6   Greyhound Station out there because I got my guy, I'm about to

7   fly out there.  I want to make sure the Greyhound Station at

8   least to the airport because I'm going to be flying them out

9   and he's going to be Greyhounding it back.  That's how I'm

10  going to start doing it to where as though, you know,

11  everything is scheduled correctly."

12        Then again, "Cuzzo, if I need a 45, can you make that

13  happen in the next load compact?"

14        Norman:  "Yeah, I would have to get the pricing on it

15  cause they're way more expensive than nines but, yeah, I can."

16        Audio message: "Cuzzo, quick question.  To make it easier

17  on my guy -- me and my guy going up there, if you fly out

18  there, can you pick him up at the airport, that way you can

19  hand off to him and just drop him off at the Greyhound join."

20        Norman:  "What time are you going to be there?"

21        Burgos:  "9, 9:30, if I'm not mistaken.  All right."

22  Q     Agent Gilmore, based on your training and knowledge with

23  the ATF, what does the term 45 mean?

24  A     .45 caliber firearm.

25  Q     And what about 9?

1  A    It'd be a 9mm firearm, a different caliber.

2  Q    You said that this text exchange incurred [sic] on

3  November 29, 2020.

4  A    Correct.

5  Q    Out of all the communications between the defendant and

6  Fredrick Norman you referenced there being over 2,000 of them.

7  A    Correct.

8  Q    Was there ever a communication where the defendant

9  indicated that he needed to speak to his brother before he

10 could continue arranging a deal?

11 A    No.

12 Q    Whether that brother be Roger Millington -- was that name

13 ever used?

14 A    No.

15 Q    Was there ever a reference where the defendant said he

16 needed to speak Kenneth or Kenny or Ken before he could

17 proceed?

18 A    No.

19 Q    Was there any -- was there ever any communications where

20 he indicated he needed to consult with another person higher up

21 before he could continue to arrange the firearms transactions?

22 A    No.

23 Q    This last communication happened on November 29, 2020.

24 What happened in this investigation on December 1st, 2020?

25 A    We approached Fredrick Norman to interview him.

Gilmore - Further Recross                    97

1  Q    You indicated on cross earlier today that Fredrick Norman

2  was not under arrest on that time.  Is that true?

3  A    Correct.

4  Q    If you were not planning to arrest him, why did the ATF

5  decide to go to down to Atlanta and approach Fredrick Norman

6  and others?

7  A    Because they were continuously buying firearms and we had

8  to stop them from buying firearms, whether that's just

9  confronting him and maybe he just stops.

10       MS. DESOUZA:  Your Honor, I have no further questions

11  on this subject.

12       THE COURT:  Cross-exam?

13                    FURTHER RECROSS-EXAMINATION

14  BY MS. CINQUANTO:

15  Q    So, Agent, I know we talked a lot about what Edwin Burgos

16  was doing during this conspiracy.  I want to focus a little bit

17  on Kenneth Burgos for a minute.

18  A    Okay.

19  Q    During all of your review of his text communication with

20  Fredrick Norman, did he ever say that he had to consult with

21  Edwin Burgos before he made a purchase?

22  A    I think it -- there's one where he says -- he kind of

23  implies that he's asking on someone else's behalf.  He says he

24  wants to know if you can get X more.

25  Q    Well, I didn't ask about --

```
 1   A    But it does not give a specific.  I'm sorry.

 2   Q    All right.  And in addition to that, did Kenneth Burgos --

 3   he also directed Fredrick Norman as to what kind of guns to

 4   get, correct?

 5   A    I believe so.

 6   Q    And he also directed -- he also told Fredrick Norman about

 7   how much money would be paid for those guns, right?

 8   A    Correct.

 9   Q    And they negotiated the cost -- he negotiated his cost

10   with Fredrick Norman, correct?

11   A    In the beginning, yes.

12   Q    All right.  And he told Fredrick Norman where -- how the

13   guns would be picked up.

14   A    I don't recall if he does.

15   Q    Well, he discussed with him.  Obviously, there was some

16   coordination about --

17   A    Yeah.  I think he says my -- my -- when the guy is on his

18   way down.

19   Q    All right.

20   A    Yes.  You're correct.

21   Q    And he also told Fredrick Norman the make, the model, and

22   the type of weapon that he wanted to purchase, correct?

23   A    I'm not sure with the make and model but the type, yes.

24   Q    Okay.  And also Kenneth Burgos, he is the one who -- this

25   was his idea to start this conspiracy, correct?
```

Gilmore - Further Recross                        99

1   A    He sends the -- he's -- he sends the initial text message

2   to Fredrick Norman.

3   Q    Okay.  Well, Fredrick Norman and Kenneth Burgos clearly

4   were the two that started this.

5   A    Correct.  That's what I mean, yes.

6   Q    Okay.  Correct?  Right?  And Fredrick Norman, you know,

7   recruited a bunch of folks.  Is that right?

8   A    Correct.

9   Q    All right.  And Kenneth Burgos recruited a bunch of folks,

10  correct?

11  A    Potentially.

12  Q    Okay.  Well, at least one that we know that he recruited

13  was Edwin Burgos, correct?

14  A    Potentially.

15  Q    Well, not potentially.  I mean I think that's been sort

16  of --

17  A    We -- I just say that to say we have no direct

18  communication between those two that says that he recruited

19  Edwin either.

20  Q    Okay.  Well, we do know that Kenneth Burgos started this

21  conspiracy and Edwin started a bit later, correct?  That is

22  something that has not been in dispute with anybody, including

23  the Government.

24          MS. DESOUZA:  Your Honor, objection.  Vagueness as to

25  what do you mean by started -- when you started.

1              THE COURT:  Rephrase the question.

2              MS. CINQUANTO:  Well, Your Honor, the question will

3    be rephrased is that it has been the Government's position all

4    along, correct me if I'm wrong, that Kenneth Burgos recruited

5    Edwin Burgos.

6              THE WITNESS:  I -- I don't recall.  I know that we

7    talked about their communications before July 11th to establish

8    that their knowledge of the conspiracy itself, so I'm not sure

9    who recruited who.

10   Q    Well, are you aware that in the presentence investigation

11   report it clearly says that Kenneth Burgos recruited Edwin

12   Burgos?

13   A    I -- I haven't reviewed the presentence report.

14   Q    All right.  And there was no objection by the Government

15   as to that fact?

16   A    Very well.

17   Q    Okay.  So then can we just agree then that at least the

18   Government maintains that Kenneth Burgos recruited Edwin

19   Burgos?

20   A    I agree, yes.

21   Q    Okay.  Thank you.  All right.  And are you also aware,

22   Agent, that Kenneth Burgos only received a three-level increase

23   for leadership in this case?

24   A    If that's what your stuff says then, yes, I agree.

25             MS. CINQUANTO:  I have nothing further, Your Honor.

 1  Thank you.

 2              THE COURT:  Any redirect?

 3              MS. DESOUZA:  Just briefly.

 4                    FURTHER REDIRECT EXAMINATION

 5  BY MS. DESOUZA:

 6  Q    Agent Gilmore, you were asked about communications between

 7  Fredrick Norman and Kenneth Burgos.  How many of those -- how

 8  many communications were there?

 9  A    157.

10  Q    And can you give the Court an idea as to when

11  communications started and when they ended?

12  A    So they began in June of 2020 and then they start to --

13  they're very front-heavy, so they are mostly in the beginning

14  and then they're intermittent throughout July, there's one or

15  two in the beginning of August, one on August 28th, and one on

16  September 1st, and then they cease altogether.

17  Q    So after September 1st, from your review, there's no

18  communications between the defendant -- excuse me, between

19  Kenneth Burgos and Fredrick Norman?

20  A    Correct.

21  Q    And to be clear, the communications between the defendant

22  and Fredrick Norman continue onward from July through the end

23  of the conspiracy, November 28th, 2020.

24  A    Correct.

25              MS. DESOUZA:  No further questions.

```
1                THE COURT:  Anything additional, Ms. Cinquanto?

2                MS. CINQUANTO:  No, Your Honor.

3                THE COURT:  Argument?

4                You may step down, Agent.

5                          (Witness excused)

6                MS. DESOUZA:  Your Honor, here the Government's

7    position is that the defendant is clearly, clearly indisputably

8    the leader of the Philadelphia side of the conspiracy.  Just by

9    the numbers, Your Honor, we're talking about 2,000 messages

10   that he had between himself and the defendant -- excuse me,

11   himself and Fredrick Norman from July up and through the very

12   end where he ends it saying, let's talk about, quote, "the next

13   load."

14               Not only are the samplings that we provided to the

15   Court indicative of the fact that he was directing the make,

16   model, the quantity, the number, we also know that he had the

17   power to stop the conspiracy from that message on

18   September 11th, 2020 where he says aggressively and annoyed

19   that Fredrick Norman is charging X amount for what he wants for

20   the straw purchasing and claims that he's going to just end the

21   conspiracy and their trafficking deal altogether.

22               Your Honor, that's the -- probably the most powerful

23   evidence showing that this is the defendant who is running

24   everything, who's making the calls.  Not only is he placing the

25   orders but when he wants to ends things, he'll say so and do
```

1  so.  Up until, as we know, a couple of days later he decides

2  that he wants to resume things and begin negotiations.  Not

3  only does he have the power to end the conspiracy, we also know

4  he has the power to end other membership in the conspiracy, and

5  that's indicative by the text message that Agent Gilmore

6  identified where the defendant says Ernest Payton is cutt, C-U-

7  T-T.  He's no longer allowed to be part of the defendant's

8  conspiracy.  The defendant, by his own words, further

9  identifies that the others underneath him, the ones that he is

10  directing are his people.  He calls them my guy, my

11  transporter, my lady.

12          And, Your Honor, that further underscores how the

13  defendant himself, as the leader, is recruiter numerous others

14  both who have been identified in the presentence report and

15  others, as Agent Gilmore described, who were identified by the

16  defendant as being my lady who is sending money down.  He

17  recruits to become those who would funnel money down to the

18  Atlanta conspirators.  Both Brianna Reed, Roselmy Rodriquez,

19  the three other women that are listed specifically in the

20  presentence report.  And the Government submits that the record

21  shows that he also is the person who's responsible for

22  recruiting Ernest Payton, who we know is the most prolific one

23  of the transporters in this case, who, by himself, brought in

24  over 100 guns on 14 different trips.

25          Finally, Your Honor, the Government also pointed out

1  for the Court how the defendant, even when he was behind bars,

2  was directing others and recruiting others.  At the time that

3  he was imprisoned, as described in the presentence report, he

4  was in the company of Roselmy Rodriquez.

5          As soon as he's imprisoned, he then has her use his

6  cell phone which he left behind to continue to communicate with

7  others, and that's because he's the person who has all the

8  information.  He is clearly the person who has the important

9  contact information.  And at one point when Ernest Payton

10  inquires whether or not he can get the phone number of the,

11  quote, "line,", that being Fredrick Norman, the supplier in

12  this case, Ernest -- or excuse me, the defendant behind bars

13  gets upset describing and that's kind of the information that's

14  going to get people like Ernest Payton killed.  People get

15  killed if you start asking about somebody's suppliers, about

16  their supplying information and their contact information.

17          All of this is to show that the defendant is the

18  person who is the leader of the conspiracy.  The defense's

19  version is that Kenneth Burgos had a role, and the Government

20  concedes at the very beginning we fronted the fact that this

21  conspiracy started when Kenneth Burgos traveled down to visit

22  his cousin, Fredrick Norman.  But quickly thereafter, all the

23  records show that the defendant was the person who took control

24  and the reins of the conspiracy.  And that's clear just by the

25  text message exchanges between not only the 2,000 between the

1    defendant and his supplier, but the fact that Kenneth Burgos

2    only had 150 or so messages and that those messages ended and

3    were sporadic, ending completely in September of 2020 while

4    this conspiracy was in full-fledged force.

5            Your Honor, the numbers in this case, the defendant's

6    own statements, his audio statements, his communications, the

7    fact that he recruited others and identified them as working

8    for him by sending them down to transport firearms, by having

9    them send money down to the Philadelphia -- excuse me, to

10   Atlanta, in furtherance of the conspiracy, clearly shows that

11   he's the leader.

12           And the argument that Kenneth Burgos may have been

13   one of the founding members or played some leadership part in

14   the beginning does not excuse the defendant's role in this

15   case.  Indeed, the guidelines that the Government pointed out

16   in the sentencing memorandum explicitly state that there could

17   be more than one leader.  In this case, in the Government's

18   point of view, for all of the reasons set forth and by a

19   preponderance of the evidence it's clear that this man over

20   here was the person who was leading everything on behalf of the

21   Philadelphia side of this firearms trafficking conspiracy.

22           MS. CINQUANTO:  Your Honor?

23           THE COURT:  Ms. Cinquanto?

24           MS. CINQUANTO:  Just briefly.

25           Your Honor, the defense is asking that Edwin Burgos

1  get the same leadership enhancement that his cousin, Kenneth

2  Burgos, got which is three levels and not four levels.

3          On June 16th of 2020, Kenneth Burgos and Fredrick

4  Norman devised a plan to purchase guns in Georgia and resell

5  them in Philadelphia.  This plan included the pricing of

6  firearms, the timeline for transporting the firearms, the

7  transfer of money, and Fredrick Norman's role in the

8  conspiracy.

9          On June 16th, Fredrick Norman recruited Brianna

10 Walker by texting her.  My cousin is down here from Philly, and

11 we set up a fun operation.  No one disputes that the cousin,

12 Fredrick Norman, to -- Norman was referring to is Kenneth

13 Burgos.  Fredrick Norman then recruits Charles O'Bannon,

14 Stephen Norman, Devin Church in the conspiracy.  The same time

15 Kenneth Burgos comes back to Philadelphia, and he recruits

16 people to join this conspiracy.  It is at that point that he

17 recruits Edwin Burgos to join the conspiracy.

18         Yet, inexplicably, it's Edwin Burgos who's now being

19 labeled the organizer and leader of this conspiracy.  This

20 characterization is incorrect and, frankly, it's not fair.

21 Edwin Burgos did not organize this criminal activity, that was

22 Kenneth Burgos.

23         Application Note 4 of the United States Guideline

24 3B1.1(a) lists factors that should be considered when

25 distinguishing between a leadership role and an organizational

1   role and that of managerial or supervisory role.  And these

2   factors include decision-making authority, the recruitment of

3   accomplices, the degree of participation and planning and

4   organizing the offense.

5            Your Honor, if Kenneth Burgos -- if the Government

6   saw fit to give Kenneth Burgos a three-level increase for

7   leadership that is the same exact increase that should be given

8   to Edwin Burgos.  No more.  Thank you.

9            THE COURT:  The Government has met their burden by a

10  preponderance of the evidence.  They've proved their point.  It

11  is more likely than not.  Accordingly, the objection is

12  overruled.  The Court fully adopts and credits the presentence

13  report, the factual findings, and guideline application, and

14  calculations set forth in the report.

15           MS. CINQUANTO:  Your Honor, may I?  The Government

16  and the defense agree that a Level 3 for a Category 2 is

17  appropriate in this case, and so that would differ from the

18  presentence investigation report's final assessment and so --

19           THE COURT:  I thought we already noted that that you

20  all had agreed to that.

21           MS. CINQUANTO:  We had agreed.  So I just wanted to

22  make sure, Your Honor, that the guide -- the effective

23  guideline range is 168 to 210 months.

24           THE COURT:  But I thought -- I already said you all

25  agreed to that.

1          MS. CINQUANTO:  Yes.  I just wanted to make sure that

2     it was on the record.  Thank you, Your Honor.

3          THE COURT:  Okay.  Ms. Cinquanto?

4          MS. CINQUANTO:  Yes, sir.

5          THE COURT:  Do you have any argument or evidence that

6     you would like for the Court to consider with respect to

7     sentencing.  And I would like it noted for the record, first,

8     that I've read your presentence memorandum and I've read the

9     many letters that were attached thereto, in support of

10    Mr. Burgos.

11         MS. CINQUANTO:  Yes, Your Honor.  May I approach,

12    Your Honor?

13         THE COURT:  Yes.

14         MS. CINQUANTO:  Your Honor, we have three witnesses

15    to call today.  And --

16         THE COURT:  All right.  Can we swear them all in at

17    the same time, but they'll be testifying from behind the rail.

18         MS. CINQUANTO:  From behind the rail, Your Honor?

19         THE COURT:  From behind the rail.

20         MS. CINQUANTO:  Yes.

21         THE COURT:  Yeah.  They can come up to the rail and

22    be sworn in.

23         MS. CINQUANTO:  Okay.  Yes, Your Honor.

24         THE COURT:  And then we can -- they can all testify.

25         MS. CINQUANTO:  Alicia, Reverend, and Antonio.  Would

1    you like them with the microphone, Your Honor?

2              THE COURT:  No, right here.  There's a microphone

3    right there.

4              MS. CINQUANTO:  Okay.  Oh, okay.  I didn't see that.

5              THE CLERK:  Okay.  We're going to swear you guys all

6    at the same time.

7              THE CLERK:  Can you raise your right hand and state

8    your names individually.

9              MR. MARRERO:  Juan Marrero.

10             MR. A. BURGOS:  Antonio Burgos.

11             MS. BURGOS:  Alicia Burgos.

12          JUAN MARRERO, ANTONIO BURGOS, ALICIA BURGOS,

13                    DEFENDANT'S WITNESSES, SWORN

14             THE COURT:  Whoever is going to testify first, the

15   other two can sit down.

16             MS. CINQUANTO:  Your Honor, the first witness will be

17   Reverend Juan Marrero.

18             MR. MARRERO:  Uh-huh.

19             MS. CINQUANTO:  Okay.  All right.  Your Honor, I'm

20   going to ask him a few questions and then he's going to talk to

21   Your Honor about Mr. Burgos.

22             THE COURT:  Okay.

23        JUAN MARRERO, DEFENDANT'S WITNESS, PREVIOUSLY SWORN

24                       DIRECT EXAMINATION

25   BY MS. CINQUANTO:

1   Q    Reverend, where do you work?

2   A    I'm the presiding Bishop of the Koinonia Fellowship of

3   Churches.  I'm also the Executive Director of Crossroads

4   Community Center.

5   Q    How long have you known Edwin Burgos?

6   A    Since he was in his mother's arms.

7   Q    You understand -- obviously, you've been sitting here for

8   this entire sentencing, correct?

9   A    Yes.

10   Q    All right.  And you understand what Edwin has pled guilty

11   to and what he's been -- and what he's being sentenced for,

12   right?

13   A    Yes, ma'am.  Uh-huh.

14   Q    All right.  I want to focus you on the time period in

15   December of 2020 and through the time of his arrest which was

16   about 15 months.

17   A    Uh-huh.

18   Q    All right?  Okay?

19   A    Yep.

20   Q    Could you describe for His Honor your connection with

21   Edwin during that time?

22   A    Yeah.  He was -- he was at a place in his life where he

23   wanted to be a productive member of society and he wanted to --

24   to get back into his -- what we believe his calling was to be a

25   boxer.  So he joined our mentor/mentee program and he enrolled

1   into Pivot Boxing Academy.

2   Q    What is Pivot Boxing Academy?

3   A    It's a -- it's an inner-city boxing gym that works with --

4   with all youth and adults and tries to use boxing as a way --

5   as an alternative to a lot of the violence and the things that

6   we see in our neighborhood.

7   Q    Now, December of 2020 is after this conspiracy had ended.

8   A    Uh-huh.

9   Q    I just want to orient everybody.

10  A    Uh-huh.

11  Q    Did your -- did Edwin have an opportunity to mentor your

12  own children?

13  A    He had.  At times he would -- my oldest son, Juan, he's

14  2 and 0 as a professional boxer with two knockouts, by the way,

15  and he has a fight coming up, and my son is sitting behind me.

16  Alex is a multi-regional golden gloves champion.  And so Rocky,

17  as we call him, Mr. Edwin, he would give them pointers and

18  would encourage them.  And, well, several people in the gym

19  would actually tell him you need to stay out of trouble, you

20  need to stay focused with your calling, get the money back by

21  boxing, stay out of trouble.

22  Q    And for the 15 months before he was arrested in this case

23  and after the conspiracy had ended --

24  A    Uh-huh.

25  Q    -- how many times would you see him on a weekly basis?

```
1   A    At least three times a week in the gym.

2   Q    Okay.  And what would he be doing in the gym?

3   A    He would be training hard as a boxer as well as -- like I

4   said, pouring into -- to other young boxers that were coming

5   up.  And I was rather impressed.  It wasn't mentioned but he

6   was a victim of gun violence when he was a young man.  So was

7   I.  That's prevalent in our community.  And so to see him to

8   continue to train knowing he had an injury from gun violence,

9   he encouraged me as a 48-year-old man.

10  Q    Now, having seen -- known Edwin his entire life --

11  A    Uh-huh.

12  Q    -- and understanding the five months or so that he

13  participated in this very serious crime, do you have an opinion

14  for His Honor about whether or not you believe that he can be

15  rehabilitated?

16  A    Absolutely.  Well, I've been -- I've been in ministry

17  25 years.  I wasn't always the bishop.  The bad lands of North

18  Philadelphia, as it's called, is the poorest zip code of any

19  major city in the United States.  I grew up there, he grew up

20  there, and I have testimonies of guys that I have worked with

21  who have done much prison time but was able to turn their lives

22  around and dedicate themselves to the Lord and whatever craft

23  or calling they have.  And so I don't believe anybody is beyond

24  redemption and I certainly don't believe Mr. Burgos is beyond

25  redemption.
```

```
 1   Q    Do you -- would you be willing to support him and his
 2   family when he is released from prison?
 3   A    Absolutely.
 4   Q    In what ways do you think you could provide support to the
 5   family?
 6   A    Oh, well, what we do is we provide employment
 7   opportunities for those who are -- who are coming out of
 8   prison.  We work with several formerly incarcerated folks.  We
 9   try to connect them to jobs, connect them to education
10   opportunities, and just try to help them stay on the straight
11   and narrow.  I'm a living example that redemption can take
12   place.
13            MS. CINQUANTO:  Thank you.
14            Does Your Honor have any questions for the pastor or
15   does --
16            THE COURT:  No.
17            MS. CINQUANTO:  -- the Government?
18            MS. DESOUZA:  No.  Thank you.
19            THE WITNESS:  Thank you.
20            THE COURT:  No.  Thank you.
21            MS. CINQUANTO:  The Reverend I think has another
22   appointment, so may he be excused, Your Honor?
23            THE COURT:  Absolutely.  Thank you.
24            THE WITNESS:  Thank you.
25            MS. CINQUANTO:  All right.  Thank you very much.
```

```
 1                          (Witness excused)
 2              MS. CINQUANTO:  Your Honor, the next witness I'm
 3  going to call is Antonio Burgos.
 4         ANTONIO BURGOS, DEFENDANT'S WITNESS, PREVIOUSLY SWORN
 5                          DIRECT EXAMINATION
 6  BY MS. CINQUANTO:
 7  Q    Antonio, what is your relationship with Edwin?
 8  A    Edwin is my cousin.
 9  Q    All right.  And so, obviously, you've known him your whole
10  life.
11  A    My whole life, yes.
12  Q    All right.  I want to focus on that 15-month time period
13  between the time when he was involved in this conspiracy and
14  before he was arrested.  Did you have an opportunity to be
15  around him during that time period?
16  A    Yes.
17  Q    All right.
18  A    I was around him.  Like the pastor said, around that time
19  frame Edwin was really locked in on his -- you know, on -- on
20  boxing.  Growing up we both didn't have a father, so we both
21  was angry a lot and just frustrated, so we motivated him to put
22  that anger into something else and boxing, like the pastor
23  said, was something he was passionate about.  He started
24  tapping into it, you know, within that time frame and we all
25  was rooting for him.  We all still are rooting for him.
```

1   Q    What about his relationship with his son?  Did you see him

2   form a deep relationship with his son (indiscernible)?

3   A    Yes.  His son is four years old and that was something he

4   was -- you know, I got a lot of kids, so I was always coming at

5   him about not having none, and he end up having a son and that

6   was something he was very proud of.  And, you know, growing up

7   we was always based off of survival like we was always trying

8   to survive a lot.

9      So when he had this son, he just wanted to make sure that

10   he didn't have to go through the things we had to go through

11   struggling.  So his son is his heart, you know.  And that's

12   when he started making drastic changes within that time frame

13   understanding the vital importance of his son.  That's why he

14   started, you know, focusing on how can I become better, and,

15   you know, that's why he started choosing boxing, right, so that

16   he can get back into how can I provide for my son on a bigger

17   scale.  And boxing was major for him for his son and seeing his

18   son -- you know, come to the gym sometimes and see his father

19   doing something positive.

20   Q    How often would you see him during that time period?  Was

21   it --

22   A    I seen him at least twice a week.

23   Q    All right.  And to the best of your knowledge between, you

24   know, November or early December of 2020 and March of 2022 when

25   he was arrested, was he involved in any criminal activity at

1  all?

2  A    No, not at all.  He was -- like I said, he was focused

3  on -- what he was focused on as far as getting his life

4  together and I was motivating him.  The family was behind him

5  because we believed in that dream, that vision, and that was

6  something he was extremely passionate about.  And like, you

7  know, he'd seen it in me.  Like, you know, before he got, you

8  know, into any trouble, I was the one getting into all the

9  trouble, making all the bad decisions, being locked up.

10       But, now, on the flip side, I have redemption.  Right?  I

11  had a judge that believed in me.  Judge Means.  I kept making

12  mistake after mistake.  He could have set me up for six to ten,

13  but instead he gave me a second chance and that allowed me to

14  get a GED in prison, come home, and then graduate from college

15  because my judge believed in me.  So sometimes a second chance

16  is hard to come by, obviously, because you got the whole world

17  counting against, but all some people need is one person to

18  believe one time that, you know, you're not a bad person.

19       We make bad decisions but that shouldn't determine who we

20  are in the future, right?  So I feel like, you know, just get

21  somebody another chance.  It matters the most.  And Judge Means

22  gave me that chance and, you know, here I am, a case manager,

23  graduated college, left the streets.  It's been over ten years,

24  so we just need somebody to believe and have hope.

25  Q    What college did you graduate from?

1  A    Community college with a high GPA, 3.7, so, yeah, we just

2  need somebody to believe in you.  So that's all.

3           THE COURT:  Congratulations.

4           MS. CINQUANTO:  Thank you.

5           THE COURT:  Any questions, Ms. --

6                      CROSS-EXAMINATION

7  BY MS. DESOUZA:

8  Q    Sir, did you know that at the time that the defendant

9  committed these offenses, he had already been previously

10 convicted of a crime, a felony?

11 A    Which one are you talking about?

12          MS. CINQUANTO:  The aggravated assault.

13 Q    Were you aware that he was convicted --

14 A    I heard about it, yes.

15 Q    -- of an aggravated assault?

16 A    But I know the details is a little different on my end

17 compared to what you guys are saying, so, you know, but, yes, I

18 know just like, you know, my mistake.

19          MS. DESOUZA:  No further questions.  Thank you.

20          THE COURT:  And, sir, I know Judge Means.  I served

21 with him.

22          THE WITNESS:  Yes.

23          THE COURT:  You traffic guns on the streets of

24 Philadelphia and --

25          THE WITNESS:  No, I haven't.

```
 1              THE COURT:  -- he let you -- he gave -- he -- I know
 2   Judge Means.
 3              THE WITNESS:  Right.
 4              THE COURT:  And I know that he would not have allowed
 5   you to have that kind of thing if you had done what this guy
 6   was accused of.  So you're telling me you trafficking guns on
 7   the street.
 8              THE WITNESS:  I said nothing about trafficking.  I
 9   said I made bad decisions.
10              THE COURT:  I understand that, but let's be clear.  I
11   know Judge Means and Judge Means has given second chances, but
12   let's consider what he gave you a second chance for.  You
13   didn't do the same thing he was accused of, correct?
14              THE WITNESS:  Correct.
15              THE COURT:  All right.  You can sit down.  Thank you.
16              THE WITNESS:  No problem.
17              THE COURT:  I appreciate you being here and
18   congratulations.
19                        (Witness excused)
20              MS. CINQUANTO:  And, Your Honor, our final witness is
21   Alicia Burgos and that is Edwin Burgos's mom.
22              THE COURT:  Yes.
23              MS. CINQUANTO:  And she's going to read a statement,
24   Your Honor.
25              MS. BURGOS:  I'm -- I'm going to read this and then I
```

1   talk -- ask you something -- not ask you but say something.

2          THE COURT:  Take your time, ma'am.

3          MS. BURGOS:  My name is Alicia Burgos.  I'm the

4   mother of Edwin Burgos.  I'm writing this letter to share with

5   you the character of my son Edwin and pray that you find mercy

6   when giving him his sentence.  I am a mother of seven children,

7   four boys, three girls.  All are now adults.  One is still in

8   Penn State College.  Edwin is the second oldest.

9          He has a heart to help others, to teach others, to

10  encourage others.  He was so faithful with his football career,

11  and then ended up following my father, who's deceased, and my

12  father's footsteps in a boxing career.  All he would do from --

13  from the moment he woke up until the -- until he was arrested

14  was go train at Pivot Boxing Gym located on 6th Street and

15  Somerset each morning, and then the rest of the day his son and

16  myself while raising him as a single mom when he was born.  He

17  was a little rough, so I decided to raise him and the rest of

18  my children in the fear of the Lord in church.

19         I have been a member of the House of God Church since

20  January 1998.  As he got older he finished high school, went on

21  to college at Cheyney University.  That's the other location he

22  played football because he also played for Frankfort.  And then

23  he had to cut it short due to funds.  I had financial issues.

24  In addition, he started training kids and boxing and working as

25  a janitor at a daycare center.  Also, he know -- he now has a

1  four-year-old son that I pray he doesn't grow up without his

2  father.

3          Edwin -- Edwin and his life -- Edwin is a very

4  educated, smart, intelligent, ambitious, fun-going person.  He

5  has a lot of potential and he still given -- and if he's still

6  given opportunity, I know he will and can put it to good use.

7  So please I also need him to help me, as well, because as a --

8  because I'm a single mom.  He was my first-born son.  I also

9  taught him I need you to be the man, even at the age of five I

10  still told him that.

11          He also has other siblings, seven of them, and he

12  need him -- they need him around to coach and to encourage

13  along his journey and like -- and he's very good at it.  He's a

14  good encourager.  So I pray that when he stands before you in

15  your courtroom that you can take his -- this letter into

16  consideration and have mercy when giving him his sentence.

17  Also, as a mom, it hurts to sit in my shoes.  I lost both my

18  parents too soon which is reason and I pray to God to ask

19  you -- that you don't let me lose my son to the prison system.

20          UNIDENTIFIED:  It's okay, mom.

21          MS. BURGOS:  Thank you for taking the time out, but I

22  just ask you to please understand and I see what he's being

23  charged with and I'm not making it null but he has so -- if

24  you -- if you just hold this here what he being charged with

25  right now is a bigger picture behind it and a bigger system --

1   a lot of people will back him up.  Rocky is a good kid and I

2   raised him in church.  He sang on a choir.  He played in the

3   plays.  We -- we was in church three days a week, Sunday --

4   faithful Sunday school student.  And I did my all, as a mom, to

5   raise my kids in the fear of the Lord because that's the only

6   right way I know to go.  Like I'm from Bad Lands.  All right?

7   I know what it took to get through those streets.  And I

8   uplifted my whole family, moved to another neighborhood, and

9   just went to church, kept them active in church.  A lot of

10  functions.

11          And he has -- he really will help you.  He has a

12  heart of gold.  He cares a lot.  And he's the second oldest and

13  I have to see my grandson worry about his dad in the system.

14  And when my kids hurt, my grandkids hurt, I hurt and it's a

15  toll on me, and I just pray and ask you to please have mercy on

16  my son and please don't let him be in the system and let the

17  system -- because it's like throwing him away and I believe in

18  him.  I believe in him and I ask you to please, please have

19  mercy on him.

20          MS. CINQUANTO:  Thank you, ma'am.

21          Your Honor, I just have argument to make.

22          THE COURT:  Yes, ma'am.

23          MS. CINQUANTO:  Would you prefer that now or after

24  Mr. Burgos --

25          THE COURT:  No.  Please make your argument now.

```
 1              MS. CINQUANTO:  Okay.  Your Honor, I'm not going

 2    to --

 3              THE COURT:  He gets the last word.

 4              MS. CINQUANTO:  -- repeat what I set forth in my

 5    sentencing memo.  I --

 6              UNIDENTIFIED:  Are you all right, mom?

 7              MS. CINQUANTO:  Oh, I didn't -- there's a lot of

 8    folks here, Your Honor.

 9              THE COURT:  Would you like to note them for the

10    record?

11              MS. CINQUANTO:  Yes, Your Honor, if I could that

12    would be great.  Thank you.

13              Your Honor, we have Mr. Darren Gray (phonetic).  If

14    you could just stand up when I call your name, please.  Some

15    folks had to leave, Your Honor, too, so --

16              THE COURT:  I understand.

17              MS. CINQUANTO:  Pop Elliott (phonetic), Charletta

18    Burgos.

19              MS. CHARLETTA BURGOS:  Right here.

20              MS. CINQUANTO:  Okay.  Germaine Oats, Jammie Oats

21    (phonetic), Mallon Oats (phonetic).  Okay.  Anna Burgos.

22              MS. MARIA BURGOS:  Maria Burgos.

23              MS. CINQUANTO:  Maria.  Oh, Maria Burgos.  Gon Lee

24    (phonetic).

25              MR. LEE:  Yes.
```

1              MS. CINQUANTO:  Okay.  Dameer Mitchell (phonetic),

2    Dwayne Snelling (phonetic).

3              MR. SNELLING:  Yes.

4              MS. CINQUANTO:  Alice Marrero.  Diandra Freeman

5    (phonetic), Gladys Williams (phonetic), Maribell Burgos.

6              MS. MARIBELL BURGOS:  Right here.

7              MS. CINQUANTO:  Erica Burgos.

8              MS. ERICA BURGOS:  Right here.

9              MS. CINQUANTO:  And we have Shyhe Tidlow (phonetic),

10   and Sharette Haines (phonetic).  All right.  Is there anybody I

11   didn't mention?  Okay.  Thank you.

12             Your Honor, again, I will not repeat what I've

13   written at length in my sentencing memo, but I did want to

14   point out a few things about Mr. Burgos.

15             This conspiracy took place over a five-month period

16   of time.  However, Mr. Burgos has lived an entire life before

17   and for a brief period of time, 15 months exactly after.  We

18   have a young man here who has a wonderful spirit and the

19   ability to overcome many obstacles.  And the reason why I

20   listed those obstacles in my sentencing memo was to show you

21   that this is person who does not need to be warehoused, that

22   he's got the resilience, the intelligence, and the ability to

23   overcome even this setback.

24             As you've read, Your Honor, in my sentencing memo, he

25   was born to a single mother who struggled financially to

```
 1   support her children.  She -- they lived in a poor section of
 2   North Philadelphia, violence, and drug sellers, and users.
 3   Drug -- violence was an everyday occurrence and drug dealers
 4   were around the streets.  When he was -- for a period of time
 5   Mr. Burgos was living with his grandparents and he had a
 6   difficult time living in that house.  His grandfather was
 7   Hispanic.  Edwin is Black.  And there was some friction there
 8   because when his grandfather would partake in alcohol or drugs,
 9   there was some violence and racism that was directed towards
10   Edwin.
11         After he left this environment, he was -- lived at
12   home with his mom where he was -- they had a wonderful
13   relationship, by all accounts, and he was there with his other
14   siblings.
15         Mr. Burgos has been diagnosed with ADHD.  He started
16   to exhibit signs of impulsivity after he was living with his
17   grandparents.  Ms. Burgos attributes that mental health decline
18   in part to living with his grandfather.  These mental health
19   struggles continued throughout his teenage years.  He attended
20   counseling at different facilities, and despite the abuse he
21   suffered as a child as well as his mental health problems,
22   Edwin did have a contact with the juvenile justice system, but
23   other than that he graduated from high school.  He got into
24   college.  He was going to play college football.  And then his
25   grades started to fail.  The family was unable to continue to
```

1  support him or to pay for tutors to help him through that.  And

2  then his grandmother died, and he sunk into a depression and he

3  left college.

4          And as I said here in my sentencing memo, Your Honor,

5  you know, for any other college student those two events would

6  not have been life altering, but they were life altering

7  because of the background or the circumstances from which Edwin

8  came.  You know, he did not have a strong father to say, son,

9  stay in school.  We will get you through this.  You know, they

10 did not have the financial resources to get the tutors or to

11 get the assistance that he needed to get through college.  But

12 instead he left, and he left -- you know, he could have had a

13 college degree and he could have gone on to achieve wonderful

14 things.

15         But he leaves college but at that point, you know, he

16 doesn't give up.  He doesn't -- you know, he doesn't give up.

17 He doesn't come back.  He doesn't, you know, starts smoking

18 dope and lay on his mom's couch and, you know, living in the

19 basement.  He gets a job, and he doesn't get any old job.  He

20 gets a job at the airport where he is, you know, as I said,

21 slinging cargo and luggage for $10 an hour.  He stays at this

22 job for two years, two years.  The heat of the summer, the cold

23 of the winter, and he keeps this job.  He does well with this

24 job.  He does so well with this job that he gets a second job,

25 and he gets a better job.  And he gets a better job at

1  Worldwide Flight Services, and he doubles his salary and he's

2  refueling jets, and he's unloading cargo.  He's doing so well.

3  And then he gets shot.  He gets shot in 2014.  It's a random

4  shooting.  He's seriously injured.  They never arrested the

5  perpetrator.  And he undergoes surgery.  He stays in the

6  hospital for two weeks, and what does he do?  Does he give up?

7  No.  He goes back to work doing that same back-breaking work

8  where he has to be on his feet all day long, loading and

9  unloading cargo.

10        And -- but as I said in my sentencing memo, you know,

11  physical wounds can heal but mental wounds don't heal.  And he

12  was diagnosed at this time with bipolar disorder.  He is

13  exhibiting signs of PTSD.  He is just having serious mental

14  problems, but even those issues don't keep him from going back

15  to work.

16        And then in 2016, he gets involved in a serious

17  assault with his cousin and -- excuse me, 2016, yeah -- with

18  his cousin, Kenneth Burgos, which is ironic, and Roger

19  Millington, which is ironic because both of those gentlemen,

20  especially Kenneth Burgos, they're involved in the same exact

21  crime but just -- but because Kenneth Burgos happens to be, you

22  know, a few days short of 18, Kenneth Burgos doesn't get a

23  six-level bump up in the guidelines.  But Kenneth Burgos, Roger

24  Millington, and Edwin, they get into a fight and his life

25  starts to unravel.  It just starts to unravel, and it's at this

1  point he just can't pick himself up anymore, and he loses his

2  job.

3         He is -- he's convicted, obviously, of that assault.

4  He goes to jail.  He starts smoking pot but he's trying, you

5  know, he's taking jobs for cash at a daycare center.  You know,

6  he's trying to become, you know, a boxer.  His son is born at

7  this time in 2019 and it's at this point that Kenneth Burgos --

8  Kenneth Burgos -- this man didn't -- this man did not wake up

9  one morning and say I'm going to start buying guns so that I

10 can feed my kid.  That never crossed his mind.  It didn't cross

11 his mind until Kenneth Burgos comes to him and says, hey,

12 cousin, I got a way for you to make some money so that you can

13 feed your kid because you don't have a job anymore because you

14 got arrested.  But Kenneth Burgos is going to spend 72 months

15 in jail and the Government is going to ask that my client get

16 222.  Where is the fairness in that?  Where is the -- how is

17 that just?  Because Kenneth Burgos happened to be a few days

18 short of 18?  It's not right.

19        And when this conspiracy ends in November or December

20 of 2020, what does he do?  He stops committing crime.  There is

21 a 15-month period where this man didn't do anything except try

22 to better his life.  There's no crimes he committed.  There's

23 no guns that were sold.  He gets back up on his feet and he

24 tries to become a professional boxer.  He's working out every

25 day, and he's trying to mentor kids, and he's trying to get

1  himself together.

2          This is not a man that needs to go to jail for darn

3  close to 20 years like the Government is going to be asking to

4  do.  It's just not right.  And we know it's not right because

5  the sentencing guidelines specifically says that sentences

6  should be tailored, in part, so that there's no disparity

7  between co-defendants who have a similar criminal history and

8  who have committed the same crime.  And we have here a

9  defendant, Kenneth Burgos, who committed not just a similar

10 criminal history, the same criminal history, the same offense,

11 and he committed the same crime.  And, in fact, Your Honor, I

12 submit he is so much more responsible for this because Kenneth

13 Burgos is the one who started this train.  And just because,

14 you know, he's only involved in June, July, and August for

15 three months and Edwin is involved from July, August,

16 September, October, into November, we're now going to add

17 12 years to his sentence.

18         So, Your Honor, I am asking you to not allow this

19 unfair, unjust disparity.  I am asking you to sentence Edwin

20 Burgos to find that the guideline range is a Category 2, a

21 Level 34, as Your Honor has found, and I'm asking you to vary

22 from the guideline range and give him a sentence which is more

23 commiserate [sic] than Fredrick Norman, who was involved in

24 this conspiracy the entire time as well as the man who started

25 this train, who got this man involved in the first place.  And

```
1    I'm asking you to sentence him to a period of time which is

2    commiserate [sic] with those two gentlemen.  It's the fair

3    thing.  It's the just thing.  It's the right thing.

4              Thank you, Your Honor.

5              And I know that Mr. Burgos would like to say a few

6    words to Your Honor --

7              THE COURT:  He'll get the last word.

8              MS. CINQUANTO:  -- when Your Honor decides.

9              THE COURT:  He'll get the last word.

10             MS. DESOUZA:  Good afternoon, Your Honor.

11             THE COURT:  Good afternoon, ma'am.

12             MS. DESOUZA:  Your Honor, the Government incorporates

13   the arguments set forth in the Government's sentencing

14   memorandum as well as the evidence that's been submitted to the

15   Court in Government's Sentencing Exhibits 1, 2, 3, 4, 5A, 5B,

16   and Government's Exhibit 6.  I'd also ask that the slides that

17   were presented to the Court be accepted as Government's

18   Exhibit 7.

19             THE COURT:  Certainly.

20         (Government's Exhibit 7 admitted into evidence)

21             MS. DESOUZA:  Your Honor, based on all that record,

22   what's set forth in the Government's sentencing argument, and

23   the arguments set forth today orally, the Government

24   respectfully submits the defendant is wholly deserving a

25   sentence within his applicable guideline range, a sentence at
```

1    the highest end, and for the reasons set forth by the

2    Government a sentence that this Court could consider

3    justifiably varying upward based on all of the characteristics

4    of the defendant, what he did, and what the consequences that

5    this community will long suffer as a result of it.

6            In terms of the guideline range, just to be clear,

7    the Government agrees with the -- and this Court has adopted,

8    the offense level calculation.  With regards to the criminal

9    history calculation has set forth in the Government's sentence

10   memorandum, the parties agree that this Court should consider

11   the defendant to have three points of criminal history for his

12   record.  And that would mean that this -- that the Court would

13   be granting a downward departure based on the sentencing

14   guideline amendments that are forthcoming next month as set

15   forth in the Government's sentencing memorandum.

16            THE COURT:  Certainly.

17            MS. DESOUZA:  As a result, Your Honor, that would

18   calculate out to a guideline range of 168 to 210 months

19   incarceration.  Your Honor, the Government respectfully

20   requests that this Court consider a sentence at the highest end

21   of that range and for the reasons stated hereforth, that this

22   Court also consider varying to the same degree an amount that

23   this Court varied with regards to Fredrick Norman.  That would

24   be this defendant's counterpart.

25            The Government would request a term of supervision

1   and a fine which would act to disgorge this defendant of any

2   unlawful gains he received as a result of his unlawful

3   trafficking of firearms.

4          And, finally, the Government would request the

5   Government's preliminary order of forfeiture which lists all of

6   the firearms in the indictment in this case, the second

7   superseding indictment involving the defendant also be ordered

8   by the Court.

9          Your Honor, the defendant, Edwin Burgos, a/k/a Rock,

10  Rocky, as he's been referred to today, is a firearms

11  trafficker.  He is a prolific firearms trafficker.  And as this

12  Court well knows and has found today, he was the leader of a

13  firearms trafficking conspiracy which over the course of five

14  months dumped nearly 300 weapons into the streets of

15  Philadelphia.  But he did more than just organize and order

16  these guns to be transported.  He recruited those very

17  transporters, and when those transporters were unavailable, he

18  recruited young women whom he was dating at the time to

19  accompany him down to Atlanta.  Those women who have now been

20  prosecuted and will become felons as a result of knowing the

21  defendant.

22         Besides recruiting others to join him in transporting

23  firearms, as this Court knows, he recruited numerous others,

24  including a woman who's in the courtroom today, to send

25  thousands and thousands of dollars down to Fredrick Norman in

1  order to fund this firearms trafficking conspiracy.  As a

2  consequence, there are numerous others who this defendant was

3  involved in recruiting and because of this defendant's

4  recruitment this operation was allowed, unfortunately, to be

5  successful.

6        For all of those reasons, his guidelines

7  appropriately calculate him to be a leader of the conspiracy

8  with four-level enhancement, and because he was a convicted

9  felon at the time that every single one of those messages that

10 he sent, every single time he sent money down, and every single

11 moment of him spending trafficking and transporting those

12 firearms back to Philadelphia, he had been already convicted of

13 a crime punishable by more than one year in jail.  This

14 defendant is deserving of what this Court has found to be an

15 offense level of 20.

16       Your Honor, for those reasons his guideline

17 calculations are appropriate and warrant consideration.  But it

18 goes beyond that.

19       The U.S. Sentencing Commission's already recognized

20 that in cases just like this one, the guidelines do not account

21 for what the defendant has been convicted of.  And with that,

22 I'm talking solely about the volume of guns.  The U.S.

23 Sentencing Commission stated in the guidelines that when it

24 comes to involvement of more than 200 guns -- substantially,

25 more than 200 guns, this Court could rightfully consider an

1    upward departure, but the guidelines go further.  That when

2    those guns involve trafficking, meaning not just the unlawful

3    receipt, not just a felon with guns, but a, in this case, felon

4    who wanted to sell those guns to others on the black market

5    when it just comes to 25 of those weapons being trafficked,

6    this Court would just -- that number would have every reason to

7    vary upward or in this case -- excuse me, or as the guidelines

8    state to award an upward departure.

9            In this case, Your Honor, we're not talking about

10   just over 200 or 201 or 202.  Frankly, even if the defense --

11   the defendant's version of when he joined the conspiracy that

12   being July 12th, 2020, was given any credit which for the

13   reasons set forth earlier this Court did not credit, he would

14   still be looking at substantially more than 250 weapons or, as

15   the Court knows, 292 guns, close to 300 guns during five months

16   were brought into this community at the behest and at the

17   profit of the defendant.

18           And, Your Honor, the guidelines recognize that this

19   type of quantity that when it's more than 200 should be

20   considered significant and is not accounted for but it should

21   be reflected in this Court's sentence.  And we know that

22   because firearms, unlike other types of trafficking, is not the

23   same thing.  When we're talking about drug trafficking or

24   narcotics trafficking, we talking about a set sum that when

25   that poison is consumed should it take a life that is the end

1    of what that type of contraband can do.

2         With firearms trafficking, as this Court well knows,

3    it's the exact opposite.  The defendant's weapons are going to

4    be reloaded again and again and that is why the ATF, led by

5    Agent Gilmore, decided that even though they did not yet know

6    every member of the conspiracy who was involved in

7    Philadelphia, they knew, as Government's Sentencing Exhibit 1

8    verifies, that these guns were being purchased almost every

9    other day by Atlanta firearm dealers.  Dozens and dozens and

10   dozens of guns.  And when they realized that this was endless,

11   they knew that they had to act because of the danger that

12   firearms trafficking can cause and, in fact, did cause in this

13   community.

14        But it's not just the guidelines, the Sentencing

15   Commission that recognizes the danger or the ATF, the defendant

16   himself knows what firearms can do in his community.  As was

17   stated earlier, he himself is a victim of gun violence on the

18   streets of Philadelphia and despite all that, despite having a

19   child that he's trying to raise in this community, as well,

20   despite living in Philadelphia at the time that it was in 2020

21   starting what is continued to be a gun violence epidemic, he

22   decided to line his pockets.

23        Your Honor, it is hard to fathom someone who could

24   care less about his family members that are here to support

25   him, about his own son, it's hard to fathom someone who cares

1   at all about his neighbors if this is what he's capable of

2   doing, unleashing guns to whomever is the highest bidder.

3           Your Honor, based on solely the volume and quantity

4   of guns this Court could rightfully vary upward, but there's

5   still more.

6           The defendant himself and his background provides

7   reasons for this Court to stick with the sentencing guidelines

8   as calculated, sentence on the highest end, and provide you a

9   reason and rationale for considering sentencing as an upward

10  variance, and that's based on his criminal record.

11          I stated earlier that he has three criminal history

12  points that the Government and the defense agrees should be

13  counted against him making him a Category 2, but that's all the

14  guidelines do.  They only calculate that he has three criminal

15  history points, but the fact remains that those criminal

16  history points are a result of a felony conviction of

17  aggravated assault and conspiracy where the defendant committed

18  a hands-on violent act using his, what has been praised today,

19  his boxing skills to break an officer's jaw, dislodged that

20  victim's teeth.

21          There was a discussion earlier today about second

22  chances.  The Government submits to this Court that second

23  chance was given to the defendant in 2016 when despite helping

24  break another person's jaw, a Philadelphia judge decided to be

25  lenient with him and sentenced him to five years probation.

1  What was the result of that?  As the presentence report

2  documents, the defendant within the next year had already

3  violated his supervision.  He was sentenced to 3- to 23-months

4  incarceration.  This defendant knows what it's like to be

5  incarcerated and yet still when he was released he absconded.

6  He had no intent to validate, to serve the sentence that that

7  Philadelphia judge provided him back in 2016.  His absconding

8  led to him starting a new conspiracy by teaming up with his old

9  co-conspirators, Roger Millington and Kenneth Burgos.

10          Your Honor, when he was apprehended there were two

11  things.

12          THE COURT:  Excuse me.  If something is so funny --

13  first of all, take the hood off.  If there's something so

14  funny, you need to go outside.  You and the guy next to you

15  should go outside.  If you can't keep quiet, then go outside.

16  You hear me?  I'm looking at you.  If you can't keep quiet,

17  please go outside.

18          UNIDENTIFIED:  I never talked.

19          MS. CINQUANTO:  All right.  Just --

20          THE COURT:  Continue, ma'am.

21          MS. DESOUZA:  Your Honor, I was describing that the

22  defendant in 2020 decided to start a conspiracy with his old

23  co-conspirators and that happened in June of 2020 through the

24  end of when the ATF disrupted that conspiracy.  But it should

25  be noticed that not only did the defendant abscond, not only

1  did he violate his supervision, but the defendant was fully

2  aware that there was a warrant out during this conspiracy for

3  his arrest for` again violating his probation.

4           As described in the presentence report, when there

5  was a vehicle stopped where the defendant and Roselmy

6  Rodriquez, the co-conspirator in this case, were found, the

7  defendant high-tailed it out of there.  He sped off from

8  Philadelphia police and a couple of days later when Bensalem

9  police approached his hotel room where he was staying with

10 Roselmy Rodriquez, the defendant was hiding under the bed.  He

11 was incarcerated, imprisoned, and at that point, in a better

12 world, the judicial system would have stopped the criminal

13 conduct from happening.  But this defendant had no intent to

14 stop his trafficking business.  And that is why the Government

15 spent time -- this Court's time this morning expressing all the

16 ways from jail that the defendant continued to direct his

17 operation.  Even behind bars, Your Honor, this defendant wanted

18 to violate the law.

19          Your Honor, that is a clear sign as to whether or not

20 this defendant can be deterred in the future.  If he's willing

21 to commit the crime behind bars, then the Government

22 respectfully submits that the only way to keep the community

23 protected is to ensure that he remains behind bars.

24          Your Honor, there's been a lot of discussion by the

25 defendant today through his counsel about the fact that he

1    spent 15 months where there's no evidence that he committed

2    crimes.  The Government's response is that the defendant in

3    this case did not choose to stop trafficking firearms, he was

4    forced to when Agent Gilmore and his team went down to Atlanta

5    and disrupted the conspiracy.  He was forced to change his tune

6    because his supplier had been caught.

7           So much of the defense's argument was that Kenneth

8    Burgos is the person to blame in this case, the defendant's

9    younger cousin, so much of it, but for all the reasons that I

10   stated earlier on this record, this defendant is not in the

11   same category as Kenneth Burgos.  And you know that, Your

12   Honor, because you heard all of the messages, the over two -- a

13   sampling of the over 2,000 messages where this defendant was

14   directing what was going on, who was going on his behalf, who

15   was sending money on his behalf, and exactly what guns he

16   wanted.  And when he wasn't happy about what he was hearing

17   from his supplier, he's the one that decided that he was going

18   to end his conspiracy.

19          Your Honor, I think it's telling to this Court that

20   this defendant is trying to claim that he didn't have the role

21   that all of the evidence shows he did, and it speaks to whether

22   or not he truly understands what he did in this case and the

23   consequences that have remained.

24          The fact of the matter is, Your Honor, the defendant,

25   unfortunately for the City of Philadelphia was very successful

1    in his firearms trafficking operation.  He intended to traffic

2    guns but they weren't found by the ATF stockpiled in a

3    warehouse.  In fact, the majority of that over 200 of them have

4    yet to be found and that's because they were dispersed to

5    whomever the defendant had arranged to purchase them.  And the

6    consequences, as this Court knows and as documented in

7    Government's Sentencing Exhibit 2, have been devastating.

8           Carjackings, shootings, arming felons, drug dealers.

9    Law enforcement has spent the last three years picking up spent

10   bullets from the defendant's weapons, the majority being in the

11   City of Philadelphia.  Only 89 of those 292 guns have been

12   recovered thus far.  But we know from those 89 weapons just

13   what gun violence can do on the streets.  At least two

14   Philadelphians have been killed, one by a homicide, another so

15   mentally disturbed that he took his own life with the

16   defendant's gun.  The defendant himself knew how deadly

17   unchecked guns could be on the streets.

18          In the Government's sentencing memorandum, the

19   Government cites the stats just from 2020, the year of this

20   conspiracy, showing that in Philadelphia in 2020 alone there

21   were 1,811 non-fatal shootings and 449 fatal shootings.  449.

22   And I wish I could say that that encompasses all of the harm

23   that can be documented from the defendant's crimes, but, of

24   course, this Court knows that that is not the case.

25          Because of what the defendant did, the City of

1    Philadelphia, the neighbors, the mothers who are sending their

2    kids to school live in fear of what's going to happen that day,

3    and there's a fear of those news headlines, Your Honor.

4    Headlines that we see from just this past weekend where

5    Philadelphia police officer lost his life as a result of gun

6    violence.  And Your Honor might have had the same concern that

7    I had when I saw that headline, headlines that are on the daily

8    of gun violence in Philadelphia.  Is this one of the

9    defendant's guns?  And if it is, was that gun taken off of the

10   street or will it be reloaded again and again?  Because, Your

11   Honor, no matter what this Court's sentence should be, no

12   matter what the defendant faces for the next year, 5 years, 10

13   years, 20 years, what he did to his own community will still

14   forever haunt.

15          Your Honor, there are 200 reasons out there for this

16   Court to vary upward.  The Government respectfully -- excuse

17   me, respectfully submits that this Court should sentence the

18   defendant to a sentence, a significant term of incarceration

19   which reflects his true culpability as the leader of this

20   organization and which punishes him for the fear that he has

21   instilled into the City of Philadelphia.

22          The Government requests a sentence -- this Court

23   consider a sentence which varies upwards the same amount of

24   variance that this Court ordered Fredrick Norman, his

25   counterpart in Atlanta, to also serve.  That would be a vary --

1    upward variance of 12 months which would be a sentence of

2    222 months imprisonment.

3              Thank you, Your Honor.

4              THE COURT:  Mr. Burgos, would you like to make a

5    statement?

6              THE DEFENDANT:  Yes.  Yes, Your Honor.

7              THE COURT:  You may remain seated.

8              THE DEFENDANT:  First and foremost, I would like to

9    apologize to the community for my poor decisions.  I have

10   made --

11             THE COURT:  Well, hold on.  Hold on.

12             THE DEFENDANT:  Yes, sir.

13             THE COURT:  What poor decision are you talking about?

14             THE DEFENDANT:  With dealing with firearms.

15             THE COURT:  The pastor is not here.  If the pastor

16   was here I'm sure he would say you got to say exactly what

17   you're apologizing for.

18             THE DEFENDANT:  With dealing in firearms without the

19   proper license to do so.

20             And -- all right.

21             THE COURT:  You mean, allowing firearms to be sold on

22   the street to people who weren't allowed to get them and

23   putting people in danger.  That's what you're apologizing for?

24             THE DEFENDANT:  Yes, sir.

25             THE COURT:  And you're responsible for that.

1          THE DEFENDANT:  Yes, sir.

2          THE COURT:  Do you think all of those people out

3    there know what you're responsible for because I got the

4    distinct feeling they don't know what you're responsible for.

5          THE DEFENDANT:  I mean, now -- now they do but during

6    the time, no, they did not.

7          THE COURT:  All right.  Continue.

8          THE DEFENDANT:  I'd first off like to, like I said,

9    apologize to the community for the poor decisions I've made

10   with dealing in firearms without the proper license to do so

11   which was totally wrong.  And I also apologize to my son and my

12   family for being away -- for being away and having to do time.

13         THE COURT:  Have you apologized to your mother who

14   did not raise you to do this kind of thing?  Did you apologize

15   to your mother?  She said she raised you at church.  You didn't

16   learn about distributing firearms in church.

17         THE DEFENDANT:  No, sir.

18         THE COURT:  So did you apologize to your mother and

19   to the preacher?

20         THE DEFENDANT:  I haven't got a chance to apologize

21   to them personally but I've apologized but it wasn't like, you

22   know -- you know, the preacher wasn't like -- but my mother,

23   yes.

24         THE COURT:  Okay.

25         THE DEFENDANT:  Basically, I apologize for these

1    immature acts.  At the time that I did commit these acts I was

2    down bad mentally and financially.  I had my own needs for

3    money and finances and my son was in need also.  During COVID

4    it was hard for me to find a job or find a way or let alone any

5    work for any type of financial stability for me or my son, so I

6    made the worst decision that I bought for -- made in my life to

7    join the conspiracy that I'm here for now.

8           After a couple of months of starting to see what the

9    impact of my poor decisions I've made towards the community

10   that I love, I was urged to just better myself, you know, to

11   change for the better for me and my son for my future.

12          I've seen there was no future in anything illegal or

13   anything that brings immediate gratification, so I decided to

14   lead by example for my son by indulging in non-profit

15   organizations, as you could see, giving back to the poor, you

16   know, feedings and things like that for the organization just

17   to give back, not to say that that was going to better anything

18   that I did do but just to give back.  You know, just to try to,

19   you know, fix things up a little bit for my personal

20   perspective.

21          Then I also got back into boxing that I've been doing

22   for the last ten years.  Everything was going great.  I was a

23   great father, athlete, citizen during the time that, you know,

24   before my prior arrest.  Basically, yeah, that's it.

25          I'm here now to basically apologize for my wrongs.

1    That's it.  I'm not taking away from nothing that I did wrong.

2    I own up to it, full responsibility for all of my partaking

3    that I did do, and, you know, I'm just sorry at this point.  I

4    just want to better myself and lead by example.  That's it.

5            THE COURT:  Thank you, Mr. Burgos.

6            It is difficult to overstate how harmful your actions

7    have been.  It's great to see that people love you and support

8    you.  I hope they know what you've actually done because unless

9    they know exactly what you've done -- and I understand that you

10   said you're remorseful for that, but unless they know exactly

11   what you've done, then they can't hold you accountable when you

12   are released and, hopefully, make you a better person.  But

13   it's difficult to overstate exactly how harmful your actions

14   have been.  Almost 300 guns on the streets, only 89 recovered.

15   This is a gift that keeps on giving.  People are going to

16   continue to get hurt and these weapons have been -- they've

17   been recovered at the scenes of crimes.  And I know counsel for

18   the Government was not suggesting in any way that one of the

19   guns that you sold were responsible for the death of a police

20   officer and I trust that's not what she was insinuating.  I

21   think what she was insinuating was that every time a heinous

22   act occurs it makes one wonder whether one of those guns was

23   involved, not to suggest that they were involved.

24           So every time there's a drive-by shooting in the

25   community, it makes you wonder, was this one of the guns.

1 Anytime someone gets killed in the community, was this one of

2 the guns.  And even after you come out of jail there're going

3 to still be people getting shot and people will be thinking, I

4 wonder was this one of the guns and is Mr. Burgos responsible

5 for that.

6          I recognize that the United States Sentencing

7 Guidelines are no longer mandatory but are advisory pursuant to

8 the Supreme Court's holding in United States v. Booker.

9 Nevertheless, the Court must consider the guidelines in

10 connection with all of the facts as set forth in 18 United

11 States Code Section 3553(a) that is to impose a reasonable

12 sentence.

13          I begin to determine your sentence by identifying the

14 statutory maximum in calculating the sentence under the

15 guidelines which the Court is required to do.  I've already

16 adopted the presentence investigation report including the

17 identification of the statutory maximums.  The parties have

18 stipulated that the criminal history is 2, not 3.

19          Count 1 that the defendant pled guilty with -- to

20 carries a statutory maximum term of imprisonment of five years,

21 followed by three years of supervised released.  Statutory

22 maximum fine is $250,000 per count, a mandatory special

23 assessment of $100 per count.

24          Count 2 carries a statutory maximum term of

25 imprisonment of five years followed by three as supervised

```
 1   released.  Statutory maximum fine is $250,000 per count with a

 2   mandatory special assessment of $100 per count.

 3            Count 3, travel with the intent to deal in firearms

 4   without a license carries a statutory maximum term of

 5   imprisonment of ten years followed by three years of supervised

 6   release.  Statutory maximum fine is $250,000 per count with a

 7   mandatory special assessment of $100 per count.

 8            This Court has adopted the presentence investigation

 9   report and the offense level calculation.  The defendant is

10   assessed at total offense level of 34.  The defendant is also

11   assessed a prior criminal history of three.  It's not six, it's

12   three, correct?

13            MR. PISCAI:  That's correct, Your Honor.

14            MS. DESOUZA:  Correct.  Three points.

15            THE COURT:  Right.  Which places him in a criminal

16   history category now of Roman Numeral II.  The guideline range

17   for Offense Level 34 and criminal history Roman Numeral II is

18   168 to 210 months imprisonment coupled with the guideline range

19   for a term of supervised release of one to three years.

20   Maximum fine for these offenses under the guidelines are

21   $250,000 per count.  The guideline range of 35,000 to $350,000

22   with a mandatory special assessment of $100 per count.

23            I must balance the factors set forth in 18 United

24   States Code Section 3553 to yield a sentence sufficient but not

25   greater than necessary to reflect the seriousness of the
```

1   offense, deter criminal conduct, protect the public, and

2   provide the defendant an opportunity for rehabilitation.  I may

3   impose a sentence outside the guidelines if I believe the

4   sentence is reasonable in light of the sentencing factors set

5   forth in 18 United States Code Section 3553(a).

6          The factors that the Court has to consider are:  one,

7   the nature and the circumstances of the offense; two, the

8   defendant's history and characteristics; three, the need for

9   the sentence to reflect the offense's seriousness to promote

10  respect for the law and provide just punishment for the

11  offense; four, the need for the sentence to afford adequate

12  deterrence to criminal conduct by others; five, need for the

13  sentence to protect the public from further crimes by the

14  defendant; six, need for the offense -- strike that -- six,

15  need for the sentence to provide the defendant with needed

16  educational or vocational training, medical care or other

17  correctional treatment; seven, kinds of sentences are available

18  in light of Booker, the Court has the authority select any

19  reasonable sentence.  The guidelines suggest a sentence between

20  168 to 210 months.  And then, finally, eight, the need to avoid

21  unwarranted sentence disparities among defendants with similar

22  records who have been found guilty of similar conduct.

23          In this, the Court has come to a conclusion that

24  there is a problem, and I have identified that problem

25  previously in my prior questioning, and it has everything to do

1   with the base offense which I believe the guidelines because of

2   a quirk in the guidelines, the defendant starts off with a base

3   offense of 20 and that base offense of 20 is primarily because

4   of the fact that he sold -- or was involved in the sale and

5   distribution of automatic weapons as well as he was a

6   prohibited person.

7          Mr. Ryan -- Roger Millington had the same base

8   offense because he was involved in the trafficking of automatic

9   weapons but also he was a prohibited person.  On the other

10  hand, Mr. Fredrick Norman, Mr. Kenneth Burgos, who also

11  trafficked automatic weapons received a base offense of 12, and

12  they had a base offense of 12 because Mr. Fredrick Norman had

13  no prior criminal record and Mr. Kenneth Burgos was involved in

14  the identical fight that Mr. Roger Millington and Edwin Burgos

15  were involved in but he, because he was a juvenile, only had a

16  base offense of 12.  That eight-point disparity is what led to

17  the guidelines being increased significantly for Mr. Edwin

18  Burgos.  That does not make him less culpable, but it is an

19  unwarranted sentence disparity and it's not fair for him to get

20  an upward guideline score simply because of a quirk in the

21  guidelines.

22          Mr. Burgos's guideline is 34.  His guideline score

23  was 34, Roman Numeral II, which is 168 to 210.  Mr. Kenneth

24  Burgos, who's a 26 because he had -- he was a juvenile and his

25  guideline range was 78 to 87.  Same thing with Mr. Fredrick

1  Norman, 70 to 87, and Mr. Roger Millington was 51 to 63.  So

2  Mr. Burgos simply -- Mr. Edwin Burgos simply because of the

3  fact that he was an adult who was a prohibited person had --

4  started out with a base level offense.  Mr. Roger Millington

5  had the same base level offense, but he was not -- strike that.

6  He was considered a minor participant and, therefore, his range

7  was much lower.

8         For that reason, the Court will vary downward to

9  avoid an unwarranted sentence disparity.  Having said that,

10  this defendant was a major player in this, re all the text

11  messages, all of the things that he said, he's a major player.

12  He's involved in distribution.  He's involved in recruitment.

13  He directly connected to the end user.  He took orders to

14  request certain kinds of weapons be purchased in Atlanta and

15  brought up.  He negotiated the price and he even continued to

16  do his distribution behind bars.

17         I understand that he is remorseful.  I understand

18  that he has significant support from the community.  The Court

19  has read all the letters and because of those letters and

20  because of the support of the persons that are here, the Court

21  is determined to vary downward.  But make no mistake about it,

22  this defendant has a lot to atone for and I hope that you all

23  who are his family and friends will hold him accountable.  Hold

24  him accountable for the harm that he's done and stop treating

25  him like a victim.  He's not a victim.  He's here because of

1    what he's done.  He is a grown man and you need to hold him

2    responsible.

3              And you need to step outside if you can't hold it.

4              MS. CINQUANTO:  Go.

5              THE COURT:  People are being harmed by his conduct

6    and he needs to atone for that and to make it up to you, and he

7    says that he wants to do that.  Let him.  Don't let him by

8    making him -- or acting like he's a victim.  He's not a victim.

9    Treat him like a grown man and then allow him to be accepted

10   back into the community again.  Stay near him.  Don't abandon

11   him.  What he did was wrong, but he can be turned around and I

12   believe that.  And I believe you want that for him but don't

13   hurt him by making it seem like somehow he took the wrong way

14   or he made a mistake.  No.  This is devastating.  The number of

15   people injured by this stuff is devastating.

16             In summary, in determining the defendant's sentence

17   I've considered the advisory guideline range of 168 to 210, the

18   factual findings in the presentence investigation report, the

19   Government and defense sentencing arguments, the testimony

20   provided by witnesses here today, the sentencing recommendation

21   made by probation, which was 188 months, the Government's

22   recommended sentence, the defense's recommended sentence.  I've

23   considered the statement provided by the defendant and the

24   factors set forth in 18 United States Code Section 3553(a).

25             Please stand, sir.  Pursuant to the Sentencing Reform

1    Act of 1984, it is the judgment of this Court the defendant,

2    Edwin Burgos, is hereby committed to the custody of the Bureau

3    of Prisons to be imprisoned for a term of 120 months.  Upon

4    release from imprisonment, the defendant shall be placed on

5    supervised released for a term of three years on each of Counts

6    1, 2, and 3.  Such terms will be served concurrently.  Within

7    72 hours of release from the custody of the Federal Bureau of

8    Prisons, the defendant shall report in person to the probation

9    office in the district to which the defendant is released.

10          While on supervised release, the defendant shall not

11   commit another federal, state, or local crime; shall be

12   prohibited from possessing a firearm or other dangerous device;

13   shall not possess an illegal controlled substance; shall submit

14   to the collection of a DNA sample at the direction of the

15   United States Probation Office; and shall comply with the other

16   standard conditions that have been adopted by this Court.

17   Defendant must submit to one drug test within 15 days of

18   commencement of supervised release, at least two tests,

19   thereafter, as determined by the probation officer.

20          In addition, the defendant shall comply with the

21   following special conditions.  Defendant shall participate in a

22   mental health program for evaluation or treatment and abide by

23   the rules of any such program until satisfactorily discharged.

24   Defendant shall refrain from illegal possession and/or use of

25   drugs.  So submit to urinalysis or other form of testing to

1    ensure compliance.  Defendant shall provide the U.S. Probation

2    Officer fully disclosure of his financial records to include

3    yearly income tax returns upon the request of the United States

4    Probation Office.  The defendant is prohibited from incurring

5    any new credit charges or opening additional lines of credit

6    without the approval of the probation officer unless the

7    defendant follows a payment schedule for any fine or

8    restitution obligation.  The defendant shall not encumber or

9    liquidate interest in any assets unless it is a direct service

10   of the fine of that -- or otherwise has the express approval of

11   the Court.

12           It is further ordered the defendant shall pay to the

13   United States a fine of $15,000 without interest.  The fine is

14   due immediately.  The Court wants the message to be shown -- to

15   be spread that this heinous crime will cost you time and it

16   will cost you money.  It is recommended that the defendant

17   participate in the Bureau of Prison inmate financial

18   responsibility providing them a payment of $25 per quarter

19   towards the amount due.  In the event the amount due is not

20   paid prior to the commencement of supervision, the defendant

21   shall satisfy the amount due in monthly installments and not

22   less than $100 to commence 30 days after release from

23   confinement.

24           It is further ordered the defendant shall pay to the

25   United States a total special assessment of $300 which is due

1    immediately.

2            In closing, I want to address the Government's

3    outstanding motion for forfeiture.  I believe forfeiture was

4    agreed upon so, therefore, the Court grants the Government's

5    motion for forfeiture.

6            MS. CINQUANTO:  Yes, Your Honor.

7            THE COURT:  Do the parties have any objection to the

8    sentence just pronounced that have not been previously raised?

9            MS. DESOUZA:  Your Honor, on behalf of the United

10   States, the Government will state an objection to the Court's

11   downward variance of 48 months and --

12           THE COURT:  Understood.

13           MS. DESOUZA:  -- we'll review further with my office

14   as to what, if any, steps we'll take after this.

15           Thank you.

16           MS. CINQUANTO:  No objection from the defense,

17   Your Honor.

18           THE COURT:  Are there any procedural errors or

19   irregularities the parties wish to bring to the Court's

20   attention?

21           MR. PISCAI:  No, Your Honor.

22           MS. DESOUZA:  Not from the United States.

23           MS. CINQUANTO:  None from the defense, Your Honor.

24           THE COURT:  Do the parties have any objections to the

25   Court's discussion of the 3553 factors?

 1             MS. DESOUZA:  No, Your Honor.

 2             MS. CINQUANTO:  Nothing.  No, Your Honor.

 3             THE COURT:  Ms. Cinquanto, please advise your client

 4  of his rights.

 5             MS. CINQUANTO:  Yes, Your Honor.

 6             Mr. Burgos, you've got 14 days from the date of the

 7  judgment and conviction that's filed to file a notice of appeal

 8  with the Third Circuit of the United States.  I will file that

 9  notice of appeal if you choose to do that, and your appeal will

10  be limited to the sentencing factors that were raised today.

11             Do you understand that?

12             THE DEFENDANT:  Yes.

13             MS. CINQUANTO:  Is that satisfactory, Your Honor?

14             THE COURT:  Are you satisfied?

15             MS. DESOUZA:  Yes, Your Honor.

16             THE COURT:  You may adjourn.

17             MS. CINQUANTO:  Thank you, Your Honor.

18             THE DEFENDANT:  Thank you, Your Honor.

19             THE COURT:  Thank you.

20             THE CLERK:  All rise.

21                    (Concluded at 3:28 p.m.)

22                         * * * * *

23

24

25

1 **C E R T I F I C A T I O N**

2

3         I, Lisa Luciano, court-approved transcriber, hereby

4 certify that the foregoing is a correct transcript from the

5 official electronic sound recording of the proceedings in the

6 above-entitled matter, to the best of my ability.

7

8

9 _____

10 LISA LUCIANO, AAERT NO.  327        DATE:  February 29, 2024

11 ACCESS TRANSCRIPTS, LLC

12

13

14

15

16

17

18

19

20

21

22

23

24

25